IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PAUL PALMER, JR. II, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Cause No. 1:19-cv-4610-JMS-MJD ) |
| INDIANA UNIVERSITY, and THE TRUSTEES OF INDIANA UNIVERSITY, | ) ) ) ) |
| Defendants. | ) ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT WITNESS STATEMENT OF DR. JAMES R. FAIRFIELD-SONN**

Pursuant to Federal Rule of Evidence 702, defendant The Trustees of Indiana University[1] (the "University"), by counsel, moves this Court to exclude the Expert Witness Statement by Dr. James W. Fairfield-Sonn, which is attached to plaintiff Paul Palmer's response to the University's motion for summary judgment [Dkt. 58-4]. In support of its motion, the University states:

**I.   INTRODUCTION**

Prof. Palmer is a senior lecturer in the Marketing Department of the University's Kelley School of Business ("KSOB") and has brought two claims of race discrimination against the University. In his first claim, he alleges that the University failed to promote him to senior lecturer earlier than the typical six-year timeline for such promotions. Specifically, Prof. Palmer alleges that he sought advice during his third year of employment, in January 2013, from Dr. Shanker Krishnan, who was then the chair of the Marketing Department, and that Dr. Krishnan discouraged him from applying at that time. Prof. Palmer alleges that he followed Dr. Krishnan's advice and

---

[1] Plaintiff incorrectly names Indiana University as a defendant in this case. The Trustees of Indiana University is the proper legal entity. *See* Ind. Code § 21-27-4-2.

chose not to apply for promotion to senior lecturer until the standard time after his sixth year. He successfully received the promotion effective August 1, 2016. In his second claim, Prof. Palmer alleges that, as compared to a white colleague, Joshua Gildea, he has had lower total compensation as a result of receiving smaller annual percentage increases to his salary and being denied additional teaching opportunities for extra pay.

As explained in more detail in the University's briefing on its motion for summary judgment, Prof. Palmer presents no evidence that Dr. Krishnan's advice with respect to early promotion or the University's decisions with respect to his compensation and teaching opportunities were impacted in any way by his race. In a misguided effort to overcome this lack of evidence, Prof. Palmer relies on a purported expert from outside the University, Dr. James W. Fairfield-Sonn, who generally opines that the University violated accepted university policies and procedures and did not give Prof. Palmer the necessary support and guidance to be successful. [Dkt. 54 at 27; Dkt. 58-4 at 3.] Dr. Fairfield-Sonn also opines that Prof. Palmer was "not treated in an equally fair or equitable manner" as compared to Prof. Gildea "in terms of availability of opportunities," including "the timing of an early promotion review, timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space to support his work responsibilities." [Dkt. 58-4 at 3.]

The Court should exclude Dr. Fairfield-Sonn's Expert Witness Statement because his opinions fail to meet the applicable standard of admissibility for expert testimony. Specifically, Dr. Fairfield-Sonn does not offer any reliable testimony that would be helpful to the jury in understanding the evidence or a fact at issue in this case. Instead, Dr. Fairfield-Sonn's opinion regarding whether the University met "accepted university policies and procedures" is irrelevant and inadmissible. In addition, the jury will be able to read and understand the applicable policy

related to lecturer promotions and determine whether Dr. Krishnan's advice was consistent with the policy without any assistance from Dr. Fairfield-Sonn's alleged expert testimony. Dr. Fairfield-Sonn's opinion that the University treated Prof. Palmer differently than Prof. Gildea with respect to employment opportunities also does not meet the standard for admissible expert testimony because he applies no methodology and merely identifies points of comparison between their qualifications and salaries. Again, this is something that is well within the province of the jury. Finally, Dr. Fairfield-Sonn fails to even render an opinion on office space or the work environment in the KSOB and instead merely provides inadmissible observations on these two points.

As a result, the Court should exclude Dr. Fairfield-Sonn's Expert Witness Statement in its entirety from the record and from its consideration of the University's motion for summary judgment and at trial.

## II.    SUMMARY OF OPINION

Prof. Palmer engaged Dr. Fairfield-Sonn to examine "whether during [Prof. Palmer's] employment with Indiana University from 2010 to 2020, Indiana University violated commonly accepted university policies and procedures, and whether or not he was provided the same opportunities as a similarly situated white, male colleague in his Marketing Department, including the opportunity to apply for early promotion, that resulted in the University failing to equitably pay him based on his African American race." [Dkt. 58-4 at 3.] Dr. Fairfield-Sonn answers that question affirmatively and concludes that Prof. Palmer "was indeed treated differently than a similarly situated white, male colleague in the same Marketing Department in terms of the availability of opportunities such as: the timing of an early promotion review, timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space to support his work responsibilities" "because, among other things, the creation and

3

maintenance of an equal opportunity work environment requires, at a minimum, a level of clarity in Human Resources Management policy communication and consistency in policy practice and implementation that, unfortunately, was not met in this case." [*Id.* at 4-5; *see also id.* at 18.] In making these broad conclusory statements regarding inequitable treatment, Dr. Fairfield-Sonn fails to apply any methodology or explanation for his conclusions and (as explained below) instead provides only a comparison of Prof. Palmer's and Prof. Gildea's salary raises and compensation for additional courses and administrative work. This opinion could not be in any way helpful to a jury because it provides no explanation as to why the University made certain decisions with respect to salary and course assignments, and rather, simply assumes that Prof. Palmer was "disadvantaged compared to [Prof. Gildea]." [*Id.* at 18.]

In support of his general conclusion, Dr. Fairfield-Sonn points to what he regards as several "noteworthy events" throughout Prof. Palmer's employment and offers opinions on those events. First, Dr. Fairfield-Sonn comments on the beginning of Prof. Palmer's employment with the University and states that, "if [he] was [Prof. Palmer's] Departmental Chair, [he] would also ask him to start thinking about how the courses he was going to teach would impact his future salary raises because in the Kelley School Annual Performance Evaluation and Feedback System, he will earn higher raises if he teaches MBA courses than Undergraduate course[s]."[2] [*Id.* at 7.] He states further that, "as a newly appointed Lecturer within the Marketing Department of the Kelley School of Business, I feel strongly that [Prof. Palmer] should be made aware of how his Lecturer position fits within the culture and structure of the school."[3] [*Id.* at 7.] In rendering these opinions, however,

---

[2] Dr. Fairfield-Sonn also opines that "given [Prof. Palmer's] qualifications and experience it was not surprising that he received the highest salary ever offered to a new Lecturer." [Dkt. 58-4 at 7.] This opinion is inadmissible because Dr. Fairfield-Sonn has no basis for this conclusion as he has no knowledge of the qualifications of the other lecturers at the time they were hired.

[3] Dr. Fairfield-Sonn then refers the reader to the section in his report called "Work Environment at the Kelley School of Business" "for more detailed information on this topic." [Dkt. 58-4 at 7.] In this section, he makes three observations about Prof. Palmer's role as a lecturer. First, he observes that different faculty positions within the Kelley School of

4

Dr. Fairfield-Sonn does not identify any relevant policy or practice that the University allegedly failed to communicate or consistently apply, and instead he merely states what advice he would have given Prof. Palmer if "[he] was [Prof. Palmer's] Departmental Chair." [Dkt. 58-4 at 7.]

Dr. Fairfield-Sonn's second opinion is that, while the policy that governs the promotion process for lecturers[4] is "clear," "the advice [Prof. Palmer] received from his [Department Chair] was not completely in line with the School's policy and if he had sought the opinion of the Dean or his former Chair, he would have heard other contradictory counsel." [Dkt. 58-4 at 9.] He continues: "From the perspective of an [Advance Collegiate Schools of Business ("AACSB")] Dean, there is a serious issue here because all Members of the Management Team should be fully aware of the policies and procedures to be followed around key Human Resource Management issues . . . ." [*Id.* at 9-10.] Notably, however, Dr. Fairfield-Sonn does not conclude that Prof. Palmer was prohibited in some way from seeking advice from other faculty about promotion, including Dean Idalene Kesner and Dr. Raymond Burke, who had previously served as chair of the department. Rather, Dr. Fairfield-Sonn simply states that the sole faculty member from whom Prof. Palmer sought advice on early promotion provided him with advice that was "contradictory" to what he may have heard from others. In addition, in providing this opinion, Dr. Fairfield-Sonn makes several unsupported assumptions. For example, he assumes that, had Prof. Palmer sought

---

Business "have different types of responsibilities, are evaluated in different ways, and depending on what type of position they hold, individuals may receive different levels of support." [*Id.* at 16.] Second, he observes that "the amount of developmental support an individual will typically receive varies as a function of the type of Contract s/he has in the Kelley School of Business." [*Id.*] And third, he observes that the Kelley School of Business has "culturally focused activities aimed at increasing diversity, equity, and inclusion," but it does not have a "diversity committee or a formal mentoring program in place." [*Id.* at 17.] Beyond simply stating these three observations, Dr. Fairfield-Sonn provides no explanation as to why, in his opinion, these observations—even if accurate—are in any way related to his conclusion that Prof. Palmer was treated differently than a white colleague—a colleague who was also a lecturer in the Kelley School of Business. In addition, he does not explain how these observations are tied to his opinion that "clarity in Human Resources Management policy communication and consistency in policy practice and implementation…was not met in this case."

[4] The promotion process for lecturers is governed by the KSOB's "Policy Statement on the Lecturer/Senior Lecturer Rank in the Kelley School of Business (Bloomington Campus)" (referred to as "Lecturer Guidelines").

advice and counsel from Dean Kesner and/or Dr. Burke, Prof. Palmer would have ultimately applied for promotion prior to his sixth year of employment. Dr. Fairfield-Sonn also assumes that the majority of the faculty charged with reviewing his dossier for promotion would have voted yes and that Prof. Palmer would have received an early promotion. Neither of these assumptions is supported by any evidence in the record.

Third, Dr. Fairfield-Sonn opines that, at their respective times of hire, Prof. Palmer had "an overall better set of Academic Qualifications," more teaching experience, and had "stronger" professional experience than his white colleague, Prof. Gildea. [Dkt. 58-4 at 12.] Other than simply making these gratuitous statements, Dr. Fairfield-Sonn provides no explanation as to why Prof. Palmer's "Qualifications and Experience" *at the time of his hiring*, as compared with Prof. Gildea's qualifications and experience, are related in any way to his conclusion that Prof. Palmer was treated differently with respect to promotion, compensation, and other opportunities.

Fourth, Dr. Fairfield-Sonn includes two charts purportedly illustrating, respectively, the compensation history for Prof. Gildea and a comparison of compensation between Prof. Palmer and Prof. Gildea.[5] [*Id.* at 13-14.] He then lists "good comparisons" of Prof. Palmer's raises to those of Prof. Gildea to show "[s]alary inequities." [*Id.* at 14.] Beyond simply comparing their respective pay increases and additional compensation, as well as summarizing the University's process for setting salary raises, Dr. Fairfield-Sonn provides no explanation for any "inequities."

Finally, Dr. Fairfield-Sonn comments on the University's assignment of office space without rendering an opinion. [Dkt. 58-4 at 16.] Rather, he merely flags certain facts for the jury's

---

[5] The University questions the accuracy of the information provided in these charts. For example, in both charts, Dr. Fairfield-Sonn states that Dr. Burke was chair of the Marketing Department at the time the faculty salaries for the 2018-19 academic year were set. This is inaccurate. As explained in the University's motion for summary judgment, it is undisputed that Dr. Krishnan was the chair who was responsible for setting those raises. [Dkt. 47 at 24.]

6

consideration but offers no opinion or specialized knowledge that could potentially aid a jury. As such, it is unclear why these statements are contained in his declaration.

### III. LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). Pursuant to Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As the proponent of Dr. Fairfield-Sonn's expert testimony, Prof. Palmer bears the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n. 10; Fed. R. Evid. 702 Advisory Comm. Notes (2000 Amendments). Pursuant to the *Daubert* framework, the court must evaluate whether the testimony is reliable and relevant. 509 U.S. at 589. The court's obligation "to determine the relevance and reliability of an expert's testimony, is vital to ensure accurate and unbiased decision-making by the trier of fact." *Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1019, 1029 (N.D. Ill. 2014) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). In addition, Rule 702 "requires a valid connection to the pertinent inquiry as a precondition to admissibility." *Goswami*, 8 F. Supp. 3d at 1030 (citing *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 805-06 (7th Cir. 2013)); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("[W]e must ensure that the proposed expert testimony…logically advances a material aspect of the proposing party's case.").

IV.     **ARGUMENT**

       A.     **Dr. Fairfield-Sonn's Opinion Regarding the University's Alleged Violation of Accepted University Policies and Procedures is Inadmissible.**

Dr. Fairfield-Sonn opines that the University treated Prof. Palmer "differently than [Prof. Gildea] in terms of the availability of opportunities" because the University did not meet a "level of clarity in Human Resource Management policy communication and consistency in policy practice and implementation" that is required for "the creation and maintenance of an equal opportunity work environment." [Dkt. 58-4 at 4-5.] Prof. Palmer proffers Dr. Fairfield-Sonn's opinion in response to the University's motion for summary judgment in an effort to convince the Court that Prof. Palmer should be excused from having to actually apply for early promotion because the University "'structured the promotion process in such a way as to exclude his candidacy for [senior lecturer] because of his race.'" [Dkt. 54 at 27 (internal citations omitted).] Specifically, Prof. Palmer's argument that Dr. Krishnan failed to provide him with support and discouraged him from applying for early promotion because of his race boils down to little more than his expert's opinion that, based on "accepted university policies and procedures," he would have given Prof. Palmer more (or different) advice. [Dkt. 54 at 27; Dkt. 58-4 at 3.]

For example, Dr. Fairfield-Sonn opines that, at the time of Prof. Palmer's initial hire: "[I]f I was [Prof. Palmer's] Departmental Chair, I would also ask him to start thinking about how the courses he was going to teach would impact his future salary raises . . . ." [Dkt. 58-4 at 7.] Dr. Fairfield-Sonn also states: "I feel strongly that Paul should be made aware of how his Lecturer position fits within the culture and structure of the school." [Dkt. 58-4 at 7.] Remarkably, Dr. Fairfield-Sonn fails to identify any specific policy or procedure that Dr. Krishnan allegedly violated. In addition, Dr. Fairfield-Sonn points to no evidence in the record that Prof. Palmer was never given any similar instruction or that other lecturers in the KSOB were given such instruction.

8

Dr. Fairfield-Sonn's opinion that he would have given Prof. Palmer additional advice does not constitute reliable and helpful expert testimony. "The law is clear that an employer's conduct need not be fair and need not represent good employment practice; it need only be non-discriminatory." *Naeem v. McKesson Drug Co., Inc.*, No. 95C5425, 2001 WL 1141803, at *2 (N.D. Ill. Aug. 14, 2001). Therefore, Dr. Fairfield-Sonn's opinion that Dr. Krishnan should have provided Prof. Palmer with additional advice under "accepted university policies and procedures" is not even the subject of this litigation. *See id.* ("[T]he fact that [defendant] acted in a manner which facilitated discrimination, retaliation or emotional distress is not an appropriate subject of expert testimony because [defendant's] employment practices-except its alleged discriminatory conduct-is not the subject of this litigation."). As a result, Dr. Fairfield-Sonn's opinion regarding the University's violation of "accepted university policies and procedures," including that he would have given Prof. Palmer additional advice, should be excluded. *See Naeem*, 444 F.3d at 608 (finding that expert's opinions that were not tied to a specific policy and appeared to be general observations regarding what is "normal or usual business practice" did not meet the requisite level of reliability).

### B. Dr. Fairfield-Sonn's Opinion Regarding Whether Dr. Krishnan's Advice was in Line with the Lecturer Policy is Inadmissible.

Dr. Fairfield-Sonn also renders the following opinion: "So, while the official [Lecturer Policy] does not prohibit a [c]andidate from applying early for a decision with no penalty if the application is not successful, the advice [Prof. Palmer] received from [Dr. Krishnan] was not completely in line with the [Lecturer Policy] and if he had sought the opinion of the Dean or his former Chair, he would have heard other contradictory counsel." [Dkt. 58-4 at 9.] This opinion is inadmissible because it offers no specialized knowledge to assist the factfinder in understanding any issues in this litigation. It is also inadmissible because it is based on pure speculation.

Pursuant to Evidence Rule 702, an expert's testimony must be the result of "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." In discussing the application of the "assist" requirement, the Seventh Circuit has explained that expert testimony that does not assist the trier of fact is properly excludable because "[s]uch expert testimony…addresses an issue of which the jury is already generally aware, and it will not contribute to their understanding of the particular dispute." *United States v. Hall*, 165 F.3d 1095, 1104 (7th Cir. 1999) (quoting *United States v. Hudson*, 884 F.2d 1016, 1023 (7th Cir.1989)); *see also Gregory-Bey v. Hanks*, No. IP 94-903-C H/G, 2000 WL 1909642, at *21 (S.D. Ind. Nov. 29, 2000). Here, Dr. Fairfield-Sonn's opinion that Dr. Krishnan's advice to Prof. Palmer regarding whether he could seek early promotion "was not completely in line with the [Lecturer Policy]" would not aid the jury because the policy is not overly technical or otherwise outside the understanding of a layperson without Dr. Fairfield-Sonn's expert testimony. He even admits that the Lecturer Policy is "clear" that "there is no prohibition on Lecturers applying 'early' . . . for Promotion" and that "there is no penalty if their application does not succeed other than that any subsequent application should occur in their sixth year of employment." [Dkt. 58-4 at 9.]

Since the Lecturer Policy is clear, the jury will be able to read the policy and determine whether Dr. Krishnan's advice was consistent with the policy without Dr. Fairfield-Sonn's expert testimony. Significantly, Dr. Fairfield-Sonn even hedges his own conclusion and never directly states that the University violated its policy or that Dr. Krishnan's advice was contrary to the policy. Rather, he simply states that had Prof. Palmer sought counsel from other faculty members, for example Dean Kesner and Dr. Burke, he may have received different advice on the pros and cons of applying for promotion at that early stage in his academic career. [Dkt. 58-4 at 9.] Such an

opinion is nothing more than pure speculation and does not include any specialized knowledge to assist the jury. *See Sommerfield v. City of Chi.*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) ("Expert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person.") (citations omitted); *Malone v. Potter*, No. 07-05530 MMM (FFMx), 2009 WL 10672523, at *5 (C.D. Cal. Feb. 25, 2009) (excluding expert's testimony regarding whether defendant followed its own policies where the "the jury [could] read the policies and determine whether defendant followed them without expert testimony"). As a result, Dr. Fairfield-Sonn's opinion regarding whether the advice Prof. Palmer received from Dr. Krishnan was in line with the Lecturer Policy should be stricken.

      **C.**      **Dr. Fairfield-Sonn's Opinion Regarding the Comparison of Prof. Palmer and Prof. Gildea is Inadmissible.**

Dr. Fairfield-Sonn further opines that, compared to Prof. Gildea, the University did not treat Prof. Palmer "in an equally fair and equitable manner" in terms of availability of employment opportunities, including "the timing of an early promotion review, timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space to support his work responsibilities." [Dkt. 58-4 at 4, 18.] In rendering his opinion, Dr. Fairfield-Sonn fails to identify or use any methodology and instead merely identifies points of comparison between Prof. Palmer's and Prof. Gildea's qualifications and salaries. In addition, Dr. Fairfield-Sonn's opinion regarding their qualifications should be excluded because he has cited no evidence that a lecturer's qualifications are considered in determining salary increases or assigning additional teaching opportunities and Prof. Palmer's own perceptions or those of his expert with respect to his qualifications are irrelevant. As a result, Dr. Fairfield-Sonn's opinion would not assist the jury in resolving any issues before this Court.

11

### 1. *Dr. Fairfield-Sonn's comparison of their qualifications does not identify or apply a methodology that connects his comparisons to his opinions or provide an opinion to assist the jury.*

Dr. Fairfield-Sonn opines that "[w]hile both individuals had sufficient Qualifications and Experience to become a Lecturer in the Marketing Department at the time of initial hire, [Prof. Palmer] did have an overall better set of Academic Qualifications." [Dkt. 58-4 at 12.] In rendering his opinion, Dr. Fairfield-Sonn merely compares Prof. Palmer's and Prof. Gildea's curricula vitae ("CVs") and highlights differences without any analysis or explanation. The Seventh Circuit has explained that an "expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff-deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir.2000) (citations omitted); *see also Huey v. UPS*, 165 F.3d 1084, 1086-87 (7th Cir. 1999) (holding that human resources expert's testimony was properly excluded because "[h]e did not explain…how [his] knowledge was employed to analyze [the plaintiff's] situation" and "gave a conclusion, but no more"). *Daubert* listed the following factors to guide district courts in assessing an expert's methodology: "(1) Whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has been met with general acceptance." 509 U.S. at 593–94. These factors apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*, 2013 WL 1024917, at *5 (S.D. Ind. 2013) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

Here, Dr. Fairfield-Sonn does not apply any reasoning or methodology to his comparisons of Prof. Palmer's and Prof. Gildea's CVs. Instead, Dr. Fairfield-Sonn merely identifies the following facts:

- "[Prof. Palmer] was a 2009 Graduate of the AACSB Bridge program for Professionally Qualified Faculty and [Prof. Gildea] was not."

- "In terms of Teaching experience, [Prof. Palmer] had already taught an MBA course at John Carroll University and [Prof. Gildea] had not."

- "As to Professional experience in Marketing, since earning an MBA degree, both individuals did have a number of important Marketing roles in a number of different companies, but because [Prof. Palmer] not only had Marketing budget responsibility in his positions, but also Profit-and-Loss responsibilities in one of their positions, [Prof. Palmer's] record is stronger on this dimension."

[Dkt. 58-4 at 12.] Dr. Fairfield-Sonn fails to explain how his knowledge or experience, when comparing these facts, compels his conclusions. Thus, his opinion regarding Prof. Palmer's and Prof. Gildea's qualifications should be excluded. *See McQuiston v. Helms*, No. 1:06-cv-1668-LJM-DML, 2009 WL 554101, at *8 (S.D. Ind. Mar. 4, 2009) (excluding expert's report where it provided no connection between his knowledge and the underlying facts that would enable him to draw the conclusion).

In addition, Dr. Fairfield-Sonn's opinion regarding their qualifications should be excluded because it would not assist the jury. Dr. Fairfield-Sonn has failed to cite to any evidence in the record—because there is no such evidence—that these "qualifications" are considered in determining salary increases or assigning additional teaching opportunities. As a result, his opinion regarding their qualifications does not address any relevant issue in this case that will assist the

13

jury in making a decision and "plaintiff's own perceptions (or the perceptions of his expert) with respect to his qualifications [for promotion] are irrelevant." *Babbar v. Ebadi*, 36 F. Supp. 2d 1269, 1279 (D. Kan. 1998); *see also Gupta v. Bd. of Regents of Univ. of Wis. Sys.*, 63 F. App'x 925 (7th Cir. 2003) (excluding testimony that "discusses only Gupta's qualifications and does not provide any information about the motivations of the department and executive committees" in concluding that Gupta "was not a qualified tenure candidate"); *Lim v. Trs. of Ind. Univ.*, No. IP-99-0419-C-M/S, 2001 WL 1912634, *34 (S.D. Ind. Dec. 4, 2001) ("[I]t is not enough for [plaintiff] simply to assert her own belief, or the belief of her expert witnesses…The fact that she, or one of her experts, thinks that the University emphasized the wrong priorities in evaluating her [qualifications] is largely irrelevant.") (citation omitted); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (upholding exclusion of expert evidence that did not make discrimination more or less likely).

### 2. *Dr. Fairfield-Sonn's analysis of the "salary inequities" does not identify or apply a methodology that connects his comparisons to his opinions.*

Dr. Fairfield-Sonn's conclusory opinion regarding the alleged "salary inequities" between Prof. Palmer and Prof. Gildea fails for the same reason as his opinion regarding their qualifications: he does not apply any methodology or analysis to compel his conclusion. He merely observes that there are a number of "valuable" comparisons between Prof. Palmer's and Prof. Gildea's salaries. [Dkt. 58-4 at 15.] He then lists the comparisons without adding any analysis:

> [R]elative base salary % raises they each had received in their first few years at the Kelley School (i.e., First raise 1.25%. for Paul and 4.8% for Joshua; Second raise 1.98% for Paul and 8.67% for Joshua). . . . [A] comparison could also be made between the base salary % raise that Paul and Joshua received in 2017 (1.30% versus 4.8%) and 2018 (2.07% versus 8.67%). The base salary % raise they received when promoted to Senior Lecture (i.e. 9.66% for Paul versus 8.7% for Joshua). An estimate provided on the impact of Paul not being promoted in 2013 versus when he was promoted in 2016. The existence of any Special Project stipends (e.g., Joshua's first year $7,500) or Special Adjustment raises (e.g., $8,000 for Paul in 2019). The

14

> difference in stipends for being a Diversity Coach (i.e., Paul received $25,000 year) of the Director of the Business Marketing Academy (i.e., Joshua received a $30,000 stipend). Not to mention additional teaching opportunities.

[Dkt. 58-4 at 15.] Dr. Fairfield-Sonn then opines that, under the KSOB salary process, both Prof. Palmer and Prof. Gildea could "both potentially do well on their base salary % raises" but that "requires taking on additional teaching and service opportunities, which for a variety of reasons has been more true" of Prof. Gildea than Prof. Palmer. [Dkt. 58-4 at 15.] Dr. Fairfield-Sonn, however, does not provide any explanation or connection between his list of potential comparisons and his conclusory opinion that there were "inequities." Accordingly, his opinion should be excluded. *See McQuiston*, 2009 WL 554101, at *8; *see also Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

### D. Dr. Fairfield-Sonn's Observations Regarding the University's Assignment of Office Space and Work Environment Are Inadmissible.

Dr. Fairfield-Sonn comments on the University's assignment of office space and the work environment at the KSOB without rendering an opinion. [Dkt. 58-4 at 16.] First, he merely observes that "[o]ffice [s]pace is often a very sensitive and contentious issue that needs to be clearly and consistently addressed or it will breed resentment and anger between and among Faculty Members," and notes that, when Prof. Palmer raised the concern with the University, "[it] quickly began working on the issue . . . and an office was identified for him to use in August 2019." [Dkt. 58-4 at 16.] It is unclear, however, whether Dr. Fairfield-Sonn is simply offering these observations or whether he is rendering an opinion (or what that opinion might be) with respect to the University's assignment of office space. Second, he merely lists the categories of faculty positions and observes that "the [KSOB] recognizes the need for and is engaged in a program to provide greater support for Diversity, Inclusion, and Equity within the school." [Dkt. 58-4 at 16.] Dr. Fairfield-Sonn notes

15

that these are "important aspects of the structure and culture within the [KSOB] [of which Prof. Palmer] needs to be aware." [Dkt. 58-4 at 16.]

Because these observations add nothing to the material issues in this case and do not constitute "opinions," they should be struck from the Court's consideration. *See Haynes v. Ind. Univ.*, 902 F.3d 724, 733 (7th Cir. 2018) (excluding expert's testimony where it "merely flag[ged] certain evidence for the fact-finder's consideration" but offered no specialized knowledge); *Hall*, 93 F.3d at 1343 (noting that "[u]nless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting influence on the jury that would be subject to control under Rule 403").

## V.   CONCLUSION

Because Dr. Fairfield-Sonn's opinions do not meet the standards for admissibility set forth in Rule 702 and in *Daubert*, the Court should exclude those opinions from its consideration during the evaluation of the University's motion for summary judgment and from the consideration of the jury in the event of a trial.

Respectfully submitted,

*Melissa A. Macchia*
Michael C. Terrell, Atty. No. 2124-49
Melissa A. Macchia, Atty. No. 29920-49
Erica M. Knear, Atty. No. 35028-53
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
mterrell@taftlaw.com
mmacchia@taftlaw.com
eknear@taftlaw.com

*Counsel for Defendant*