UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PAUL PALMER, JR. II,                                  )
                                                      )
                     *Plaintiff*,                     )
                                                      )
            v.                                        )          No. 1:19-cv-04610-JMS-MJD
                                                      )
INDIANA UNIVERSITY and TRUSTEES OF INDIANA            )
UNIVERSITY,                                           )
                                                      )
                     *Defendants*.                    )

**ORDER**

Plaintiff Paul Palmer, Jr. II, who is African American, was hired by Defendant Indiana University ("IU") as a non-tenure track lecturer in the Kelley School of Business ("KSOB") Marketing Department in August 2010. After being discouraged from applying for an early promotion in 2013, Professor Palmer applied for and was promoted to the position of senior lecturer in 2016. In 2018, Professor Palmer began raising concerns with the Associate Dean of Faculty regarding racial discrimination based on the early promotion of a Caucasian lecturer, Joshua Gildea, and other favorable treatment. Professor Palmer ultimately initiated this litigation related to those concerns, and asserts claims against IU and the Trustees of Indiana University[1] for race discrimination in violation of Title VII of the Civil Rights Act of 1964. [Filing No. 1.] IU[2]

---

[1] Defendants state in one of their filings that "Plaintiff incorrectly names Indiana University as a defendant in this case. The Trustees of Indiana University is the proper legal entity. *See* Ind. Code § 21-27-4-2." [Filing No. 67 at 1 n.1.] The proper course of action to seek a change to the docket is for the parties to confer regarding whether the proper defendants are named, and to file the appropriate documentation seeking a change, if necessary. Should Defendants wish to eliminate IU as a party, they must file a motion.

[2] For simplicity, in this Order the Court will refer to Defendants collectively as "IU."

has filed a Motion for Summary Judgment, [Filing No. 46], and a Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn, [Filing No. 66], and Professor Palmer has filed a Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 69].  All of these motions are now ripe for the Court's decision.

# I.
## STATEMENT OF FACTS

At the outset, the Court notes that Professor Palmer failed to comply with the Court's Practices and Procedures, which provide that "[i]n a supporting brief, [a party must] cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document."  [Filing No. 6 at 4.]  Instead of following this citation format, Professor Palmer cites to "DOE," which is not defined anywhere in his briefs but which presumably refers to the Designations of Evidence he has filed at Filing Nos. 57 through 60.  His citations are further confused by the fact that he does not explain the numbers he cites to within the "DOE."  For example, he cites to "DOE 124 at 12:8-11," to support the first sentence of his Factual Background and Statement of Material Facts in Dispute.  [Filing No. 54 at 2.]  Only after trial and error did the Court determine that this citation refers to "Exhibit 124" filed within the DOE.  Instead, the proper citation for this material is "Filing No. 60-6 at 4."

To further complicate matters, Professor Palmer's exhibits are not filed in numerical order within his "DOE."  For example, Exhibit 124 is the sixth attachment in his fourth "DOE" docket entry, [Filing No. 60-6], but Exhibit 133 is the fourth attachment in his second "DOE" docket entry, [Filing No. 58-4].  The haphazard fashion in which counsel filed the exhibits that make up Professor Palmer's "DOEs," coupled with the vague citations in Professor Palmer's briefs, have made the Court's review of the Motion for Summary Judgment unnecessarily and extremely

difficult, particularly given that Professor Palmer has filed over 500 pages of exhibits in opposition to the Motion for Summary Judgment. The Court does not have a duty to "scour every inch of the record" to find potentially applicable evidence, *Johnson*, 325 F.3d at 898, but has done its best to locate the evidence Professor Palmer has cited.[3] However, his counsel should ensure that they follow the Court's Practices and Procedures in this and other cases going forward.

The following factual background is set forth pursuant to the standards detailed below. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    KSOB Leadership, Programs, and Faculty

Idalene Kesner has been the Dean of the KSOB since 2013, and Laureen Maines has served as Executive Associate Dean during that time. [Filing No. 60-6 at 4.] Dean Kesner has the ultimate authority over KSOB decisions, including salary decisions. [Filing No. 60-6 at 7.] The KSOB has approximately 325 total faculty, 11 of whom are African American individuals. [Filing No. 60-6 at 10.]

The KSOB offers an undergraduate program, an MBA program, various other master's programs, certificate programs, and a doctoral program. [Filing No. 60-8 at 3-4.] The MBA program offers both an in-person residential program and an online program called "Kelley Direct Online." [Filing No. 60-1 at 21.] The residential and online MBA programs are "comparable in

---

[3] The Court also notes that while Fed. R. Civ. P. 56 and L.R. 56-1 require citation to the record to support each fact relied upon, those rules do not require citation to *every* spot in the record where support for each fact appears. The parties frequently provide long strings of citations to spots in the record that support the same fact, and these superfluous citations are cumbersome and unnecessary.

terms of the expectations for teaching quality and the quality of the students." [Filing No. 60-1 at 21.]

The KSOB employs both tenure track faculty and non-tenure track faculty, including clinical faculty and lecturers, to teach classes in the undergraduate and MBA programs. [Filing No. 60-1 at 13-14.] Lecturers typically carry a course load of 18 credits, "unless they have some sort of administrative appointment." [Filing No. 60-1 at 13-14.] Tenure-track faculty have a lighter teaching load to account for their research responsibilities, and clinical faculty (who must have a doctoral degree, but focus on teaching and service) teach 15 credits. [Filing No. 59-4 at PP2; Filing No. 60-1 at 21.]

### B.   Reviews of KSOB Lecturers

Lecturers are reviewed annually, and are assigned a number from 1 to 4, with 1 being the highest. [Filing No. 60-1 at 8; Filing No. 57-1 at 3.] A rating of 1.0 to 1.9 is considered "outstanding." [Filing No. 57-1 at 2.] Lecturers' evaluation ratings are weighted at .9 for teaching and .1 for service. [Filing No. 57-1 at 1.]

The number of hours above the normal teaching load is considered as part of a lecturer's annual review. [Filing No. 60-1 at 22.] Pursuant to KSOB policy, a lecturer may teach up to 15 credits over his or her assigned teaching load, including 3 credits maximum for residential classes and 15 credits maximum for Kelley Direct classes. [Filing No. 58-1.] The base payment for teaching 3 credits for residential classes is $7,500, and the base payment for teaching 3 credits for Kelley Direct classes is $15,000. [Filing No. 60-1 at 21; Filing No. 60-5 at 15.]

The KSOB's Performance Evaluation and Feedback System provides that student evaluations are "the primary determinant of the quality of teaching performance," and that other considerations include the "[d]evelopment of new courses, significant renovations of existing

4

courses," "[t]eaching a breadth of courses and/or across multiple programs that enhances an individual's value to the department," "[c]ourse/program difficulty," and "[i]nvestments in teaching improvement and pedagogy." [Filing No. 57-1 at 3.]  Professor Ray Burke, the eventual Dean of the KSOB Marketing Department, believed that the courses with more difficulty included the MBA core course, required courses, graduate-level courses, and large enrollment courses, and that "it is as challenging to teach in the online program as it is in the residential MBA program." [Filing No. 60-1 at 9.]  Professor Palmer was not informed that certain courses carried more weight for evaluation and promotion purposes than other courses, and this was not in writing in KSOB's policies.  [Filing No. 60-7 at 22-23; Filing No. 60-7 at 48-49.]

The Performance Evaluation and Feedback System also notes that "faculty members' service contributions may vary across discipline,…university,…Kelley School,…department,…and community," but "[l]eadership roles in any of these areas is highly valued," and the KSOB "values service that balances external (discipline/company) with internal (department/school/university) contributions."  [Filing No. 57-1 at 4.]  Service activities can include committees that faculty members serve on; the number of events that they attend; the ways that they serve the department, school, and university at large; and participation in career fairs, corporate dinners, lunches, and alumni events.  [Filing No. 60-4 at 14; Filing No. 60-5 at 18-19; Filing No. 57-1 at 4.]

Lecturers have the opportunity to earn multiple awards, including the Trustee Teaching Award, which automatically compiles nominations for the "top 6% of full-time lecturer and clinical faculty – combined – whose primary duty is teaching." [Filing No. 59-7.]  Additionally, the Panschar Award is based on the past 3 years of student evaluations for the Undergraduate level

of teaching, and for which faculty members are nominated by the Department Chairperson. [Filing No. 59-8.]

### C.    Faculty Raises

Faculty raises are determined annually based on the faculty evaluations and the chair's judgment, and with consultation with the deans. [Filing No. 60-1 at 10; Filing No. 57-4.] The chair of the Marketing Department, along with the KSOB's Executive Associate Dean for Faculty and Research, typically sets the starting base salary for a newly hired lecturer, and the base salary is determined pursuant to several factors including the lecturer's level of experience in academia and/or the marketing field prior to joining IU's faculty, the role the lecturer will have with the KSOB (e.g., leadership role), and the lecturer's versatility in terms of teaching a variety of marketing courses. [Filing No. 46-5 at 5; Filing No. 46-9 at 3; Filing No. 46-10 at 4; Filing No. 46-12 at 7-8.] The chair and the Executive Associate Dean also review the salaries of the other Marketing Department lecturers to determine a baseline range for a new faculty member's starting salary. [Filing No. 46-9 at 3.]

There is no mathematical formula for the assignment of raises – for example, a faculty member may get up to a 10% raise with a promotion, or a larger raise to achieve equity among other faculty members. [Filing No. 60-1 at 9-10; Filing No. 60-5 at 11-12.] It is uncommon for a faculty member to receive a 5% raise without a promotion or equity issue involved. [Filing No. 60-1 at 10.] Raises are ultimately reviewed by Associate Dean Maines and approved by Dean Kesner. [Filing No. 60-6 at 5-7.] Lecturers are typically given small annual base salary raises, and the Marketing Department has a specific process for assigning raises and also uses a faculty annual review process. [Filing No. 46-9 at 3.] Each January, faculty members submit an annual report for the previous calendar year and a curriculum vitae to the Marketing Department chair.

[Filing No. 46-9 at 3.]   The Marketing Department's administrative assistant compiles the submitted material into a spreadsheet for review.  [Filing No. 46-9 at 3.]  The chair then forwards the spreadsheet and the submitted material to a committee made up of two or three full professors from the Marketing Department, and the committee analyzes the information and each committee member independently evaluates each lecturer's contributions to teaching and service.  [Filing No. 46-9 at 3.]  After completing their review, the committee meets with the chair at the end of February to discuss and assign an evaluation score to each lecturer's teaching and service.  [Filing No. 46-9 at 3.]  The committee uses the Marketing Department's Performance Evaluation and Feedback System, assigning a score ranging from a "1.0" to a "5.0," with "1.0" being the highest. [Filing No. 46-9 at 3; Filing No. 46-9 at 10-11.]  The mathematical score assigned by a faculty committee is considered, but the chair ultimately uses his or her discretion to determine the raise percentage for each faculty member and takes into consideration short-term ratings, long-term performance, internal equity (or a comparison with other faculty in the same faculty class), and market equity (or how the faculty's value might be relevant).  [Filing No. 60-5 at 7; Filing No. 60-5 at 11-12.]

Each department is provided a finite allocation of dollars to use for salary raises, so allocating additional dollars to one faculty member necessarily decreases the amount left to allocate to other faculty members within the department.  [Filing No. 46-5 at 7-8; Filing No. 46-9 at 3-4.]  The chair distributes the budgeted dollars and assigns raises for each faculty member. [Filing No. 46-5 at 7-8; Filing No. 46-9 at 3-4.]  The chair then meets with the Executive Associate Dean to discuss the recommended raise for each faculty member, and the salary raises are finalized after the Board of Trustees approves the budget in early summer.  [Filing No. 46-4 at 2.]

**D.**      **The KSOB's Policies for Promotion to Senior Lecturer**

The promotion process for lecturers is set forth in the KSOB's Policy Statement on the

Lecturer/Senior Lecturer Rank in the Kelley School of Business (Bloomington Campus) (the

"Lecturer Guidelines"). [Filing No. 46-4 at 3; Filing No. 46-13 at 2-13.] The Lecturer Guidelines

provide as follows:

**B. Promotion to Senior Lecturer**

> **1. Timing.** Individuals are required to apply for the rank of Senior Lecturer
> during the sixth year of their probationary period as Lecturers. Promotion
> to the rank of Senior Lecturer results in a 5-year renewable contract or a 3-
> year rolling contract. In special or exceptional cases promotion to the rank
> of Senior Lecturer also may occur upon initial appointment or earlier than
> the sixth year of an individual's probationary period if the candidate
> demonstrates outstanding teaching and service contributions. Shortened
> probationary periods may be the result of demonstrated teaching excellence
> at another institution and/or outstanding professional accomplishments
> related to the individual's area of teaching and/or service. Lecturers who
> submit their dossiers earlier than the sixth year of probation and are denied
> promotion may be reconsidered at a future point in time. It is recommended,
> however, that any subsequent promotion dossier submission follow the
> normal timeline, which requires submission in year 6 of the probationary
> period.
>
> **2. Promotion criteria.** Promotion to Senior Lecturer shall be based on
> several criteria consistent with the overall mission of the [KSOB] including,
> but not limited to the following: high quality classroom teaching and
> contributions to pedagogical practice, high quality service to the School
> and/or University in support of teaching, and achievement of AQ or PQ
> status.
>
> Examples of the teaching components that may be taken into consideration
> in the evaluation process are listed below:
>
> - A record of high quality teaching demonstrated by excellent and
>   sustained classroom performance and evidenced by high numbers on
>   student evaluations
> - Evidence of peer observation/evaluation of teaching
> - Receipt of letters from students (particularly unsolicited)
> - Receipt of teaching awards (internal and external to the School) and
>   other recognition of one's teaching

8

- Evidence of leadership/participation in the development of School or departmental instructional goals and objectives
- Participation in curriculum development and innovation
- Development of new course materials for use in an instructor's own course that <u>extends beyond</u> basic or routine teaching materials
- Development of new teaching materials for use beyond an instructor's own course including textbooks, cases, instructor manuals, student guides, websites, videos, and other teaching media
- Receipt of grants to develop new courses or revise old ones
- Participation in teaching and learning development activities at the School, University or peer professional group level
- Publication of journal articles devoted to pedagogical issues
- Presentations at local and national conferences about pedagogical issues

Lecturers are expected to inquire into both the subject matter of their field and current pedagogy to maintain and advance the quality of instruction at the [KSOB]. As such, Lecturers are expected to participate in School and University pedagogical/learning activities (e.g., SOTL (Scholarship of Teaching and Learning) seminars, teaching workshops, Kelley's Professional Development Program), as well as national and regional peer professional groups focused on subject matter content and pedagogy.

[Filing No. 46-13 at 6-7 (emphasis in original).]

The Lecturer Guidelines provide some examples of service elements that will be examined when candidates are considered for promotion to senior lecturer, and also outline other conditions that must be met. [Filing No. 46-13 at 7-9.] They also provide the following:

**3. Promotion Procedure.** The departmental chairperson or equivalent supervisor may recommend Lecturers for promotion to the rank of Senior Lecturer during the probationary period. Promotion to the Senior Lecturer rank requires the preparation of a portfolio or dossier. Thus, before any decision is made within the department or School, the Lecturer should be notified that he or she is under consideration and that within a reasonable period of time, such as four to six weeks, he or she may submit materials relevant to such consideration for review by the appropriate department or area supervisor.

\*                  \*                  \*

The department chairperson or equivalent supervisor should prepare a statement reviewing the candidate's qualifications. Prior to preparing this document, the department shall solicit input from the candidate's colleagues

9

within the department regarding the candidate's teaching and service contributions. Qualified colleagues who hold the rank of Senior Lecturer and above are eligible to participate in an advisory vote. To ensure consistency, the voting procedure used by the department shall be identical to the procedure used by the Senior Lecturer Review Committee, described in the next paragraph.

The completed dossier, along with a copy of the statement prepared by the department chairperson or equivalent supervisor, will be given to the Senior Lecturer Review Committee, which is a standing committee appointed by the Dean's Office. This committee is responsible for examining the candidate's total record in a comprehensive and rigorous fashion. The committee's members should vote on the candidate. The decision to promote should be based on the candidate achieving a distribution on scores that meets one of the following conditions:

a. The candidate scores an "excellent" (5) on teaching and at least a "satisfactory" (2) on service.

b. The candidate scores at least "very good" on one of the two dimensions (teaching or service) and at least "good" on the remaining dimension.

\*              \*              \*

The committee's vote shall be documented and supported by a written statement/report. This vote, the committee's report, and the statement of the department chairperson or equivalent supervisor shall be given to the [KSOB's] Associate Dean for Faculty & Research, who in turn, will provide a recommendation to the Dean of the [KSOB].

[Filing No. 46-13 at 8-9.]

If a lecturer seeks an early promotion, the first step is to indicate to the department chair that he or she is interested, and to set up a meeting with the chair to go through the record and rationale for seeking early promotion. [Filing No. 60-5 at 20.] Seeking an early promotion is rare, and the conversation between the department chair and the lecturer should take place the summer before the lecturer seeks the early promotion. [Filing No. 60-5 at 20-21.]

E.    **KSOB's Marketing Department**

Professor Burke was the chair of KSOB's Marketing Department between 2009 and 2012, and also from 2018 to the present. [Filing No. 60-1 at 3.] Professor Hari Shanker Krishnan served as the chair of the Marketing Department from 2012 to 2018. [Filing No. 60-1 at 3.]

KSOB's Marketing Department is comprised of 41 faculty members, and Professor Palmer was the only African American faculty member in the Marketing Department until the Fall of 2019. [Filing No. 60-1 at 3-5; Filing No. 60-7 at 41.]

F.    **KSOB's Diversity and Equity Initiatives**

The diversity, equity, and inclusion initiatives involve strategic hiring by seeking diverse candidates, and an overarching faculty diversity plan. [Filing No. 60-4 at 7-8.] Additionally, KSOB holds town halls and has a case competition which is created with the help of underrepresented minority students and involving underrepresented minority fact patterns. [Filing No. 60-2 at 4-5.] The Marketing Department has no formal faculty mentoring program or diversity committee, but does have a diversity document which outlines its efforts at improving diversity among faculty and student recruiting. [Filing No. 60-1 at 27-28.]

G.    **Professor Palmer's Education and Experience**

Professor Palmer earned a Bachelor of Science degree in Mechanical Engineering from Rose-Hulman Institute of Technology and a Master of Business Administration degree from the KSOB. [Filing No. 57-7 at 1.] Professor Palmer also has a Master of Education Leadership, an Educational Specialist Degree, and is working toward a doctorate in education. [Filing No. 60-7 at 5.] Prior to teaching, Professor Palmer worked at several large businesses and led numerous successful marketing initiates. [Filing No. 57-7.]

After working in the corporate world, Professor Palmer served as an Adjunct Professor of Marketing at John Carroll University's Boler School of Business, teaching two of the required foundational marketing courses in the MBA/Executive MBA curriculum.  [Filing No. 57-7 at 1; Filing No. 60-7 at 6.]  In 2009, Professor Palmer graduated from the Association to Advance Collegiate Schools of Business Bridge Program for Professionally Qualified Faculty.  [Filing No. 57-7 at 1; Filing No. 60-7 at 6.]

### H.    Professor Palmer's Initial Employment at IU

On August 1, 2010, Professor Palmer began his employment with IU as a non-tenure track lecturer in the KSOB Marketing Department.  [Filing No. 46-1 at 6-8; Filing No. 46-2 at 1; Filing No. 46-3 at 1.]  His starting base salary was $80,000 for the ten-month academic year.  [Filing No. 46-1 at 6.]  IU initially appointed Professor Palmer for three academic years, from August 1, 2010 through May 31, 2013, and reappointed him for several terms thereafter – most recently through the academic year 2025-2026.  [Filing No. 46-4 at 1.]

When IU hired Professor Palmer, he also took an administrative position with the KSOB MBA program as Diversity Coach.  [Filing No. 46-5 at 11.]  The Diversity Coach position "focus[ed] on student recruiting with an emphasis on diversity recruiting."  [Filing No. 46-2 at 1.]  As Diversity Coach, Professor Palmer coached KSOB's MBA students who were members of the Consortium, an organization founded in the mid-1960s by three schools, including IU, to focus on recruiting underrepresented minority students to MBA programs.  [Filing No. 46-1 at 6; Filing No. 46-6 at 2-3; Filing No. 46-6 at 6-8; Filing No. 46-7 at 5-6; Filing No. 46-8 at 6; Filing No. 46-8 at 11.]  IU paid Professor Palmer a $25,000 stipend for each year that he served as Diversity Coach, and he was released from six credits of the normal 18-credit lecturer teaching load, which reduced

his required teaching load to 12 credits.  [Filing No. 46-1 at 6-8; Filing No. 46-2 at 1; Filing No. 46-5 at 11; Filing No. 46-8 at 15.]

IU did not provide a job description for the Diversity Coach role, or a specific supervisor to evaluate Professor Palmer's performance in this role or to provide objectives and goals.  [Filing No. 60-7 at 9; Filing No. 60-7 at 19.]  Professor Palmer spent 8 to 12 hours per week in his role as Diversity Coach, and sometimes more time during "signature events or capstone events," which would sometimes require him to be "on the road with the students for four to five days and/or [require] an extensive amount of planning to execute."  [Filing No. 60-7 at  19.]

I.     **Professor Palmer's Teaching Load and Opportunities**

The chairman of the Marketing Department is responsible for assigning courses to faculty members each year, and also works with the chairs of the KSOB programs when determining which faculty members to assign to particular courses.  [Filing No. 46-9 at 2.]  Courses are assigned based on several factors, including the faculty member's expertise and experience, whether he or she was hired to teach a certain set of courses or in a certain subject area, his or her expression of interest to teach additional courses, his or her availability to teach certain courses, his or her interest in developing new courses, and student demand for particular courses.  [Filing No. 46-5 at 14; Filing No. 46-9 at 2; Filing No. 46-11 at 1-2; Filing No. 46-12 at 12-13.]

Professor Palmer has regularly taught in the undergraduate program since IU hired him, and he has taught in the online Kelley Direct program since the summer after his second year of being employed at IU.  [Filing No. 46-1 at 26; Filing No. 46-9 at 4.]  At one point, Professor Palmer expressed interest in creating a course for the Kelley Direct program, but he did not ask the Marketing Department chair to add additional courses to his teaching load.  [Filing No. 46-1

at 25-26; Filing No. 46-11 at 2.]  Before his promotion to senior lecturer, Professor Palmer had

never declined an opportunity to teach a class.  [Filing No. 60-7 at 8; Filing No. 60-7 at 48.]

Throughout his employment with IU, Professor Palmer has resided in the Cleveland, Ohio

area, travelling to Bloomington, Indiana and remaining on campus at least three days per week to

teach his courses and to participate in other IU-related activities.  [Filing No. 46-1 at 3; Filing No.

46-1 at 8-9.]  At times, the Marketing Department chairs have declined to offer Professor Palmer

certain teaching and service opportunities because of his lack of availability or presence on

campus.  [Filing No. 46-9 at 2-3; Filing No. 46-11 at 2.]  However, Professor Palmer volunteered

to be at IU whenever needed, and no one advised him that there were any issues with his presence

on campus.  [Filing No. 59-4 at 6-7.]  Additionally, Professor Palmer's position as Diversity Coach

restricted him from teaching residential "overload" courses – or credit hours over and above his

12-credit hour requirement.  [Filing No. 46-11 at 2.]  He was able, however, to teach overload

courses that were part of the Kelley Direct program.  [Filing No. 46-11 at 2.]

### J.    Professor Palmer Discusses Early Promotion With Professor Krishnan

In January 2013, Professor Palmer emailed Professor Hari Shanker Krishnan, chair of the

Marketing Department at the time, regarding concerns about the future of lecturers at the KSOB

and the possibility of going up early for a promotion to senior lecturer.  [Filing No. 46-12 at 23-

24; Filing No. 46-14 at 1.]  In his email, Professor Palmer stated:

> I do have a couple of things I need to talk to you about.
>
> I know that the Bloomington Faculty Council has been pushing for some changes
> to the process and criteria regarding lecturer appointments and reappointments. A
> couple of those changes would not necessarily be favorable for, or to, lecturers.
> These changes could potentially impact me, so I wanted to discuss my situation
> with you.  I know that last year my contract was extended by one year to the end of
> the 2013/2014 academic year, which was very much appreciated.  However, under
> the original terms of my contract, I would be up for a new, renewed 3 year contract

now.  That contract, if renewed would extend my employment until the end of the 2015/2016 academic year.

Net, I have a contract through 2014, but that does not provide the same security for me and my family as does one through 2016.  We all know that the "system" could change next year and potentially adversely impact me.  I'd like to talk to you about my options, specifically going through the review for the extension out to 2016 or going up early for a promotion to Sr. Lecturer.

[Filing No. 46-14 at 1.]

When Professor Palmer and Professor Krishnan met, Professor Krishnan explained that it is rare for lecturers to apply for a promotion to senior lecturer before their sixth year and, based on Professor Palmer's teaching record leading up to that point, cautioned him against doing so.  [Filing No. 46-9 at 4; Filing No. 46-12 at 23-24.]  Specifically, Professor Krishnan suggested that Professor Palmer wait to apply for a promotion so that he could strengthen his record over the next few years, have more data points for the decisionmakers to consider, and become more visible to the Marketing Department as the Diversity Coach and relating to other service activities.  [Filing No. 46-9 at 5.]  Professor Krishnan also explained to Professor Palmer that "no one had ever gone up early for promotion without the support of a department chair."  [Filing No. 46-1 at 22.] Professor Palmer does not know whether Professor Krishnan's advice to him would have been different if he was white.  [Filing No. 46-1 at 23.]

At the time that Professor Palmer would have sought early promotion, his average rating on all responses in the student evaluations was 6.41 on a 7.00 scale, and his overall average in the Dean's 8 rating (a selection of 8 particular questions on student evaluations that were deemed "the best indicators of a faculty member's performance") was a 6.54 on a 7.00 scale.  [Filing No. 59-5 at 15.]  Professor Palmer took Professor Krishnan's advice and did not apply for promotion during

his third year.  [Filing No. 46-1 at 23.][4]  He also did not apply for promotion during his fourth or fifth year.  [Filing No. 46-1 at 24-26.]

### K.     Professor Palmer Applies For and Receives a Promotion In Spring 2016

In the Spring of 2016, during his sixth year at IU, Professor Palmer applied for a promotion to senior lecturer.  [Filing No. 46-9 at 5.]  No one assisted Professor Palmer in compiling his dossier for promotion.  [Filing No. 60-7 at 50.]  At that point, Professor Palmer had taught a total of 84 credit hours, increased the number of courses he had taught, and had developed an immersion course for the Kelley Direct program.  [Filing No. 46-1 at 26-27; Filing No. 46-9 at 5.]  The Marketing Department and the Senior Lecturer Review Committee voted in favor of promoting Professor Palmer, and Professor Krishnan, who was still the chair of the Marketing Department, strongly supported Professor Palmer's promotion in a February 2016 memo to Dean Kesner, stating:

> Overall, I rate Professor Palmer's teaching performance as "Excellent."  He has shown that he is consistently one of the best teachers in the [KSOB], he has won a university-wide award, and has shown the ability to develop new courses.

[Filing No. 46-9 at 5; Filing No. 46-9 at  25; Filing No. 46-12 at 25; Filing No. 46-15.]    Dean Kesner and Associate Dean Maines ultimately approved Professor Palmer's promotion, and he was promoted to senior lecturer effective August 1, 2016.  [Filing No. 46-9 at 5.]

### L.     Professor Palmer Resigns as Diversity Coach

After Professor Palmer was promoted to senior lecturer, IU attempted to change his compensation for Diversity Coach, but Professor Palmer provided information to substantiate his

---

[4] During the 2012-2013 academic year, Professor Palmer discussed an overseas teaching opportunity, but later learned that Professor Krishnan offered the opportunity to a Caucasian faculty member.  [Filing No. 60-7 at 50-51.]

role and Ash Soni, Executive Associate Dean for Academic Programs who oversees the MBA Program, accepted the information and his compensation was not changed. [Filing No. 59-4 at 4.

In July 2016, Kyle Cattani became the program chair of the KSOB's full-time MBA program. [Filing No. 46-7 at 3.] Thereafter, Professor Cattani and Rebecca Cook, the staff director of the MBA program, determined that the Diversity Coach should place a greater emphasis on recruiting new students. [Filing No. 46-1 at 30; Filing No. 46-6 at 11-12; Filing No. 46-7 at 7-8.] On February 2, 2017, Professor Palmer emailed Professor Cattani and Ms. Cook to resign from the position as Diversity Coach, stating:

> I am an advocate and supporter of [IU, the KSOB,] and diversity. After careful consideration, I have concluded, that I am not the person who should be responsible for driving diversity recruiting at the [KSOB], nor am I interested in being the person. The position should be a full-time endeavor conducted by someone who focuses on diversity and inclusion recruitment and retention in education. I simply do not have such a background. In addition, the job itself should be, and when done correctly is, a full-time role for someone. Done well, diversity and inclusion is not something that is usually accomplished in 1.67 days per week, or in 12 hours per week… My background, interests and reasons for returning to IU were primarily to teach. I agreed to help with our Consortium students, but it was not a principal reason for my employment.

[Filing No. 46-16 at 2.] Professor Palmer listed "[a]dditional reasons why I am not a fit for this role." [Filing No. 46-16 at 2-3.]

Professor Palmer continued to serve as the Diversity Coach for the 2016-2017 academic year, and the KSOB then hired a full-time Associate Director of Diversity and Inclusion. [Filing No. 46-1 at 30-31; Filing No. 46-6 at 12.] Because Professor Palmer resigned as Diversity Coach, he no longer received the $25,000 stipend associated with that position, the six-credit teaching release, or the office in the building housing the MBA program. [Filing No. 46-1 at 31.]

**M.      Professor Palmer's Salary Raises**

Professor Palmer's starting base salary was $80,000, and IU gave him the following base

salary raises:

- 1.25% to $81,000 for the 2011-12 academic year;

- 1.98% to $82,600 for the 2012-13 academic year;

- 1.69% to $84,000 for the 2013-14 academic year;

- 2% to $85,680 for the 2014-15 academic year;

- 1.65% to $87,090 for the 2015-16 academic year;

- 9.66% to $95,500 after his promotion to senior lecturer for the 2016-17 academic year;

- 1.3% to $96,750 for the 2017-18 academic year;

- 2.07% to $98,750 for the 2018-19 academic year; and

- 2.16% to $100,885 for the 2019-20 academic year.

[Filing No. 46-4 at 2; Filing No. 46-9 at 4; Filing No. 46-9 at 23.] Professor Palmer received an

additional $8,000 increase in his base salary for the 2019-20 academic year, making it $108,885.

[Filing No. 46-4 at 2-3.] Professor Palmer's total compensation was $141,000 in 2017, $127,550

in 2018, and $133,304 in 2018. [Filing No. 59-5 at 14.]

During his first and second years with the KSOB, Professor Palmer won multiple

performance awards, including the Trustees Teaching Award in 2012, which is given for teaching

that has positively impacted student learning. [Filing No. 57-10 at 2; Filing No. 59-7.] He was

also a finalist for the Trustees Teaching Award in 2011, 2013, and 2016, and a finalist for the 2020

Panschar Teaching Excellence Award. [Filing No. 57-10 at 2; Filing No. 58-5.] Professor Palmer

also won the IU Access the World Through Education Award in 2011, the Student Choice Award

in 2012, and the IU Athletics Teaching Recognition Award in 2012, and was a finalist for the Neal-

Marshall Teaching Award in 2012. [Filing No. 57-10.] Professor Palmer was not considered for an IU Trustees Teaching Award for 2017, 2018, or 2019, and one individual who was considered in 2019 had a lower average for her student evaluation score than did Professor Palmer. [Filing No. 59-4 at 5.]

Since Professor Palmer joined IU's faculty, he had the highest base salary of all lecturers and senior lecturers within the Marketing Department up until the 2019-2020 academic year, and has received the highest dollar amount of salary increases of all lecturers and senior lecturers who have remained employed with IU during Professor Palmer's employment. [Filing No. 46-19.]

### N.      IU Hires Professor Gildea

IU hired Professor Joshua Gildea, who is Caucasian, as a lecturer in the Marketing Department, effective August 1, 2016, at a starting base salary of $82,500. [Filing No. 46-9 at 5.] Professor Gildea was also hired as the director of the Business Marketing Academy ("BMA") within the full-time MBA program. [Filing No. 46-20 at 3-4.] When Professor Gildea began his employment, he also received an additional annual stipend of $30,000 for the BMA director position in lieu of a credit to his teaching load, which he continued to receive through the 2019-20 academic year. [Filing No. 46-8 at 15; Filing No. 46-10 at 16; Filing No. 46-20 at 5.] In the 2020-21 academic year, Professor Gildea will no longer receive the $30,000 stipend and will, instead, receive 7.5 credits against his teaching load. [Filing No. 46-20 at 5.] When IU hired Professor Gildea, he had no teaching experience but did have corporate experience. [Filing No. 55-2.]

### O.      Professor Gildea's Raises and Awards as Lecturer

In 2017, the KSOB gave Professor Gildea a 4.85% pay increase, making his salary $86,500. [Filing No. 55-6 at 3.] In 2018, Professor Gildea received an 8.67% raise, making his salary

$94,000.  [Filing No. 46-4 at 2-3; Filing No. 55-6 at 3; 55-7 at 3.]  Professor Palmer received a

2.07% salary increase the same year.  [Filing No. 55-6 at 3.]

In April 2018, Professor Gildea received the Fettig/Whirlpool Distinguished Lecturer

Award, which was given at the discretion of Associate Dean Maines without departmental input,

which provided Professor Gildea with an additional annual stipend of $5,000, and for which

Professor Gildea did not apply.  [Filing No. 55-8; Filing No. 60-1 at 13; Filing No. 60-3 at 15.]  In

2017, Professor Gildea was nominated for the Panschar Award, which considers performance over

three years of teaching, even though he had only been teaching at IU for 1.5 years.  [Filing No. 59-

8; Filing No. 60-3 at 12; Filing No. 60-3 at 18.]

## P.      Professor Gildea's Teaching Opportunities

In his first year of teaching at IU, Professor Gildea was offered overload teaching and for

nearly every year of his career at IU he "taught a full load and a full overload, which is 15 additional

credits plus the academy, which is an additional six or seven and a half credits."  [Filing No. 60-3

at 8.]  Professor Gildea used his overload credits on Kelley Direct online courses because they paid

better.  [Filing No. 60-3 at 14.]  With his overload teaching, Professor Gildea's total compensation

was $144,300 in 2017, $213,925 in 2018, and $215,360 in 2019.  [Filing No. 59-5 at 14.]

## Q.      Professor Gildea is Promoted

During the first year of his employment, Professor Gildea attended annual meetings with

Associate Dean Maines regarding the promotion process in order to learn about the requirements

for promotion.  [Filing No. 46-20 at 9-10.]  In January 2018, Professor Gildea spoke to Professor

Krishnan, who was the chair of the Marketing Department at the time, regarding his decision to

apply for promotion to senior lecturer at the end of his third year of employment with IU.  [Filing

No. 46-9 at 5-6; Filing No. 46-20 at 10-11.]  Professor Krishnan told Professor Gildea that

Professor Gildea's contributions were "lining up with the requirements" for early promotion, and that the only risk was that if he did not get the promotion in his third year, he would have to wait until his sixth year to reapply.  [Filing No. 60-3 at 13-14.]  Based on his own evaluation of his teaching and service, and his conclusion that he had achieved excellence in teaching, Professor Gildea decided on his own to apply for promotion.  [Filing No. 46-20 at 10-11.]

Professor Ray Burke, who had just replaced Professor Krishnan as the chair of the Marketing Department, helped Professor Gildea with his dossier materials and made sure that Professor Gildea had a peer observation of his teaching.  [Filing No. 57-20 through Filing No. 57-29; Filing No. 59-1.]  Professor Gildea submitted his dossier for promotion to senior lecturer at the end of his third year of employment.  [Filing No. 46-11 at 4.]  The Marketing Department and the Senior Lecturer Review Committee voted to promote Professor Gildea, and Professor Burke recommended Professor Gildea's promotion.  [Filing No. 46-11 at 4.]  Professor Burke felt that Professor Gildea deserved to be promoted because he "had done a considerable amount of teaching," due to "the quantity of courses that he had taught, [and] the number of sections he had taught," and had "a considerable teaching record."  [Filing No. 60-1 at 18.]  Although Professor Gildea had not taught before coming to IU, Professor Burke felt that the quality of Professor Gildea's teaching was reflected in student evaluations of his teaching and his service activities, including "teaching in the MBA program, in the Kelley Direct program," and "serv[ing] as academy director for the [BMA]."  [Filing No. 60-1 at 18.]  Associate Dean Maines and Dean Kesner approved Professor Gildea's promotion, and he was promoted to senior lecturer effective August 1, 2019.  [Filing No. 46-11 at 4; Filing No. 46-20 at 11.]  Professor Gildea was given an 8.7% raise as part of his promotion, making his base salary $103,400 for the 2019-20 academic year.  [Filing No. 46-4 at 3.]

**R.      Professor Palmer Raises Concerns Regarding Bias and Discrimination**

In the summer of 2018, Professor Palmer raised concerns regarding "a salary discrepancy that [he] had noticed…relative to the marketplace and relative to [Professor] Gildea," and also regarding "racial discrimination as it relates to not just [his] salary but opportunities [he] had been given," including "opportunities to go up early for promotion." [Filing No. 46-1 at 37.] Professor Burke and Professor Palmer planned to meet to discuss these concerns once Professor Palmer returned to campus. [Filing No. 46-23 at 4.]

> On July 19, 2018, Professor Palmer emailed Professor Burke and stated:
>
> I just checked project salaries, and [Professor Gildea] received a $7,500 raise for the 2018/2019 school year to bring his base pay up to $94,000. That's $14,000 in 3 years.
>
> What do I need from the university? I need at least $10,000 to keep my salary competitive with the marketplace and my family's needs. And from a URM perspective, this doesn't look right at all! And you can share that with leadership. It looks very biased. I'll put my experience and accomplishments next to his any day.

[Filing No. 46-23 at 2.] Professor Burke and Professor Palmer spoke on the phone later that day regarding Professor Palmer's concerns. [Filing No. 46-11 at 4; Filing No. 46-23 at 2.]

Professor Palmer also reached out to Arlen Langvardt, a retired faculty member in the KSOB, regarding his concerns of alleged discrimination and asked for advice on how to proceed. [Filing No. 46-1 at 60; Filing No. 46-24 at 2-3.] Professor Langvardt told Professor Palmer that he should contact Associate Dean Maines. [Filing No. 46-1 at 61.] Professor Palmer emailed Associate Dean Maines on August 7, 2018, stating:

> As [Professor Langvardt] mentioned to you, I am very unhappy, as I feel that there are a number of situations where [Professor Krishnan] has been actively biased and/or discriminated against me as an under-represented US minority. The issue with my compensation, especially in relationship to favoritism shown to [Professor] Gildea, is just the tipping point.

22

I am hoping that you can address the issues to a satisfactory degree. However, I do not want to simply hear someone justify [Professor Krishnan's] actions. I definitely feel that [Professor Krishnan] has not at all been an advocate for US based diversity candidates.

[Filing No. 46-24 at 3.]

Associate Dean Maines responded the next day, stating in part:

With respect to a meeting, I am happy to speak on the phone or meet in person at a time that is convenient for both of us. In the initial meeting, I believe that I just need to listen to get a solid understanding of your concerns. If you want, that meeting could be a phone call. Then I would look into your concerns and we could meet again. I think it would be best for that second meeting to be in person, and I suspect you would be back from your overseas trip before I would finish my investigation and we have the second meeting.

[Filing No. 46-24 at 2.]

Professor Palmer and Associate Dean Maines spoke on the phone on August 10, 2018, and Professor Palmer told Associate Dean Maines that he had concerns about his salary and that the percentage amount of his raises had been lower than Professor Gildea's. [Filing No. 46-4 at 3.] He also told Associate Dean Maines that Professor Krishnan had advised him not to apply for a promotion during his third year. [Filing No. 46-10 at 30.] Professor Palmer also complained regarding his assignment of a cubicle in the Marketing Department rather than a private office, and stated that this made it difficult for him to meet with corporate visitors. [Filing No. 46-4 at 3; Filing No. 46-10 at 27-32.] Professor Palmer told Associate Dean Maines that the collaboration and conference rooms were not sufficient to meet his needs. [Filing No. 46-4 at 3; Filing No. 46-10 at 31-32.] He noted that Professor Gildea was provided an individual office with a window. [Filing No. 46-4 at 3; Filing No. 46-10 at 31-32.] Associate Dean Maines told Professor Palmer that she would look into his allegations and follow up with him. [Filing No. 46-4 at 3; Filing No. 46-10 at 27.]

After the August 10, 2018 phone call, Associate Dean Maines looked at the salary data for all of the lecturers within the Marketing Department and determined that it showed that Professor Palmer had, and had always had throughout his employment, the highest base salary of any other lecturer or senior lecturer within the Marketing Department. [Filing No. 46-4 at 3-4.] Associate Dean Maines also looked at the raises for each faculty member and concluded that Professor Palmer's raises each year were consistent with the raises of other lecturers and senior lecturers. [Filing No. 46-4 at 3-4.] Although Associate Dean Maines did not find any discrepancies with Professor Palmer's salary or percentage raises, she recognized that he had recently lost his $25,000 stipend as Diversity Coach and, in an effort to allow him to recoup that loss, she requested and received approval for Professor Palmer to receive an $8,000 raise. [Filing No. 46-4 at 3-4.]

Associate Dean Maines also looked into Professor Palmer's concerns regarding his office space, and confirmed that when the building housing the Marketing Department was renovated, Professor Palmer still had an office in the building housing the MBA program. [Filing No. 46-4 at 4.] Because he had that separate office space, Professor Palmer was not provided with an additional office in the Marketing Department, but was still provided a cubicle there. [Filing No. 46-4 at 4.] When Professor Palmer stepped down as Diversity Coach at the end of the 2016-2017 academic year, there were no vacant offices that had been allocated to the Marketing Department. [Filing No. 46-4 at 4.]

On October 17, 2018, Associate Dean Maines met with Professor Palmer to discuss what she had learned through her investigation into his allegations. [Filing No. 46-4 at 4.] She acknowledged several of Professor Palmer's concerns, and offered to increase his salary by $8,000 for the 2019-2020 academic year, which was the next cycle for salary raises. [Filing No. 46-4 at 4.] Additionally, Associate Dean Maines told Professor Palmer that the KSOB was in the process

of building additional offices and that she thought there would be office space available for him in late December 2018 or early 2019. [Filing No. 46-4 at 4.] Professor Palmer was aware of offices that were empty and available during this time. [Filing No. 60-7 at 3-4; Filing No. 60-7 at 34.] Associate Dean Maines also told Professor Palmer that he could use a former KSOB Dean's office until she could secure more permanent office space for him. [Filing No. 46-4 at 4.] Associate Dean Maines was under the impression that she had addressed Professor Palmer's concerns through this conversation, and that they had agreed upon a solution. [Filing No. 46-4 at 4.] Between the Fall of 2017 and the Summer of 2019, Professor Palmer was the only senior lecturer in the Marketing Department who did not have an assigned office. [Filing No. 60-7 at 34.] A PhD student was assigned office space in the Marketing Department for an entire summer before Professor Palmer received his assigned office. [Filing No. 60-7 at 43-44.]

On February 8, 2019, Professor Burke announced to the Marketing Department in an email that Professor Gildea had decided to seek promotion to senior lecturer, which was during his third year of employment at IU. [Filing No. 46-25 at 1-2.] Professor Palmer responded to Professor Burke's email, writing "Isn't this way early? I thought you had to wait until year 5, 6 or 7 to go up for promotion for senior lecturer? Could you please explain the urgency/break from history?" [Filing No. 46-25 at 1.] Professor Burke responded to Professor Palmer the next day, stating:

> Thanks for your note. Kelley School lecturers have always had the option to come up early for promotion to senior lecturer. In [Professor Gildea's] case, he consulted with [Professor Krishnan] last year and, after reviewing evidence of his teaching quantity, breadth, and quality, they felt he had demonstrated "Excellence in Teaching" by the Kelley School standards. In [Professor Gildea's] three years at Kelley, he has taught more than 96 credit hours across the undergraduate, graduate, and Kelley Direct programs in multiple disciplines (Sales, B2B Marketing, International Marketing, Core Marketing Strategy, etc.). Ninety-six credit hours works out to more than five years of full load teaching (18 credit hours per year). He has also contributed significantly on the service side with his leadership of the BMA, which is now the largest academy in the MBA program.

If you have any comments, concerns or questions about [Professor Gildea's] performance, please be sure to attend Tuesday's meeting and share your thoughts. The School wants the Department's perspective as input to its evaluation of promotion cases.

*     *     *

p.s. – As a side note, I should mention that, in very rare cases, a new faculty member skips the process and is hired as a senior lecturer. However, this hasn't happened in Marketing for several years :-).

[Filing No. 46-25 at 1.]

On February 10, 2019, Professor Palmer sent an email to Associate Dean Maines to follow up on the issues they had discussed during the fall semester, writing:

On August 10, we met via phone, where I outlined to you that I had a number of significant concerns regarding racial discrimination and/or bias by IU and [Professor Krishnan] (as my department chair) against me. During the call, I detailed for you how racial discrimination had negatively impacted my salary, promotion to senior lecturer, office space allocation, and additional teaching opportunities within the marketing department and the [KSOB].

On October 17, we met in your office to resolve the concerns that I had provided. In that meeting you acknowledge[d] a number of my concerns, including the fact that I was being paid approximately $8,000 annually less than I should be (and should have been) paid when you compare my salary increases and performance with the raises of my non-minority peers. In addition, we talked about the fact that I am forced to sit in a cubicle, while a white, significantly junior colleague in my department is afforded an office, with an external facing window. [Professor Krishnan] did not feel that I warranted the use of an office for university business, and in many cases, the use directly supports and advances the interest of the university and the [KSOB].

To date, there has been little follow-up on any of my concerns. My salary concerns have still not been addressed. You mentioned that you had some office space coming available in January 2019 that I could have access to, but I still sit in a small cubicle. All of my courses involve real world projects and partnerships, oftentimes with significant corporate partners of IU and the [KSOB]….

Now I receive an email that [Professor] Gildea, the non-minority, significantly junior colleague is going up for promotion nearly 3 full years earlier than I was allowed… Early in my tenure at IU, I had asked [Professor Krishnan] about going up for promotion early as well and was discouraged by him from doing so. In fact, in an email to [Professor Krishnan] dated 1/22/2013 (on which Ray Burke was also

26

cc'ed), I specifically told [Professor Krishnan] that "I want to talk about my options, specifically going through the review for the extension out to 2016 or going up early for a promotion to Sr. Lecturer."  My request came on the heels of winning the Trustees Teaching Award and an award from IU Disability Services for Students.  I knew that teaching was something I truly loved.  Instead of being supportive, [Professor Krishnan] blatantly discriminated against me, which included making me wait twice as long as [Professor Gildea] to go up for promotion to senior lecturer.  This discrimination occurred even though my student evaluation scores were always in the 6.7s and 6.8s, and higher than those received by [Professor Gildea].

Of course, my grievance is not about [Professor] Gildea, but about the lack of opportunity and income and collegiality extended to me by my department and by [the KSOB].

This situation is untenable and unacceptable to me.  As I mentioned to you during our prior talks, I want to give you the opportunity to make the situation right before I have to sit down and consider other options.  By my calculations, this racial discrimination and bias has cost my family and I nearly $90,000 in compensation alone to date.  That number will continue to climb by $8,000-10,000 per year until it is addressed.

[Filing No. 46-26 at 1-2.]  Professor Palmer attached to his email a spreadsheet comparing the percentage raise increases he received for his second and third years of employment with the percentage raise increases that Professor Gildea received during his second and third years of employment.  [Filing No. 46-26 at 4.]  The spreadsheet, which appears to have been prepared by Professor Palmer, reflects that Professor Palmer received a 1.25% raise in his second year (2011-12 academic year) and a 1.98% raise in his third year (2012-13 academic year), and Professor Gildea received a 4.85% raise in his second year (2017-18 academic year) and an 8.67% raise in his third year (2018-19 academic year).  [Filing No. 46-26 at 4.]

Associate Dean Maines responded to Professor Palmer the same day, writing:

Thanks for your email.  Let me address some of the issues you mention.

1.     As you indicate, when we met in October I indicated that we would be adding $8000 to your salary at the next raise period (July 2019).  (The university makes adjustments to faculty salaries once a year).  That is still the plan.

2.      At the October meeting, I indicated that you have access to Dan Smith's office whenever you needed to meet with your corporate guests. My understanding from our meeting was that you would have the staff let you in his office as needed, but if you would prefer a different arrangement for getting access to his office, please let me know. I can have FOS get you a key to the office if you prefer.

3.      The new faculty offices in the UCSO space are not ready and my understanding from Teresa Kase is that they are unlikely to be ready until Spring Break. (At this point, only the classroom is finished and it was five weeks behind schedule.) I have you on the list as having an office reserved. As soon as we have the exact date for the availability of the offices, I will make sure that you know.

With respect to your concern about [Professor] Gildea, I will discuss this with [Dean Kesner] who I have copied on this email. It is possible that I may need to discuss this with [Professor Burke] as well. Are you ok with me discussing your concerns about [Professor Gildea] with Ray?

[Filing No. 46-27 at 3.]

After discussing the issue of Professor Gildea's promotion with Professor Burke, Associate Dean Maines told Professor Palmer that "department chairs only give advice about the likelihood of success" of promotion and that faculty members can apply for early promotion even when the department chair cautions them against doing so.  [Filing No. 46-4 at PP 20; Filing No. 46-10 at 30.]

At the February 12, 2019 departmental meeting to discuss Professor Gildea's promotion, Professor Palmer questioned the basis for Professor Gildea's early promotion and considerations discussed during the meeting were that: Professor Gildea felt like he was being "watched" because he was a probationary employee until his promotion to senior lecturer, and was on a shorter term contract; he was the "[p]rimary breadwinner of his household"; he took a "significant pay cut to come" to IU; and he needed to "take care of his family."  [Filing No. 59-4 at 3-4.]  Professor Gildea's student evaluation numbers were not listed in his promotion materials, but his mean Dean's 8 rating was 6.44 and his overall average rating was 6.34 on the 7.0 scale.  [Filing No. 59-5 at 15.]

28

S.    **The EEOC Charge**

On May 15, 2019, Professor Palmer filed a Charge with the Equal Employment Opportunity Commission ("EEOC").  [Filing No. 1-1.]  He checked boxes indicating that he was complaining of race discrimination that was continuing in nature, and detailed his allegations regarding being discouraged from pursuing an early promotion, salary inequities, and disparities related to teaching opportunities and office space assignments.  [Filing No. 1-1 at 1-2.]

T.    **The Lawsuit**

The EEOC issued a Right to Sue Letter on August 21, 2019, [Filing No. 1-2], and Professor Palmer initiated this litigation on November 19, 2019, [Filing No. 1].  Professor Palmer sets forth a claim of race discrimination under Title VII against IU.  [Filing No. 1.]

## II.
### IU'S MOTION TO EXCLUDE THE EXPERT WITNESS STATEMENT OF DR. FAIRFIELD-SONN

A.    **Applicable Law**

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue….

Many factors will bear on the inquiry…." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

The Court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis omitted). The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

**B.      Summary of Dr. Fairfield-Sonn's Opinion**

Dr. Fairfield-Sonn joined the faculty of the Barney School of Business at the University of Hartford in 1982 as an untenured Assistant Professor of Management. [Filing No. 58-4 at 3.] He was promoted to tenured, and "rose through the ranks from an Assistant to an Associate and then on to a Full Professor of Management, which is the position [he] currently hold[s] at the school." [Filing No. 58-4 at 3.] He has also held several administrative positions at the Barney School of Business, including Chair of the Department of Management, Director of the Executive MBA Program, Interim Dean, and permanent Dean of the School of Business, among other positions. [Filing No. 58-4 at 3.]

Dr. Fairfield-Sonn sets forth the scope of his opinion as follows:

This statement examines whether during Paul Palmer's employment with [IU] from 2010 to 2020, [IU] violated commonly accepted university policies and procedures, and whether or not he was provided the same opportunities as a similarly situated white, male colleague in his Marketing Department, including the opportunity to apply for early promotion, that resulted in the University failing to equitably pay him based on his African American race.

[Filing No. 58-4 at 3.]

In formulating his opinion, Dr. Fairfield-Sonn was provided various documents obtained in discovery, certain deposition transcripts, various pleadings, IU's brief in support of its Motion for Summary Judgment, and Declarations from various individuals.   [Filing No. 58-4 at 4.]   Dr. Fairfield-Sonn summarized his opinion as follows:

In my opinion, the central issue to be examined in this case is whether or not the cumulative impact of decisions made by agents of [IU] in regard to the terms and conditions of Paul Palmer's employment as a Lecturer and subsequently Senior Lecturer with the [KSOB] unfairly disadvantaged [Professor Palmer].  Specifically, while serving as a Lecturer and then later as a Senior Lecturer in the Marketing Department at the [KSOB] was [Professor Palmer] denied opportunities that were made available to a similarly situated white, male colleague, who joined the same Marketing Department as a Lecturer six years after [Professor Palmer's] arrival? Moreover, were these denied opportunities of sufficient importance and consequence that they constituted sufficient grounds to negatively impact his employment?

Based on a review of information relevant to the case, the weight of evidence indicates that, yes, [Professor Palmer] was indeed treated differently than a similarly situated white, male colleague in the same Marketing Department in terms of the availability of opportunities such as: the timing of an early promotion review, timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space to support his work responsibilities.  These findings clearly speak to why there is evidence of prejudicial treatment in this case. Namely, because among other things, the creation and maintenance of an equal opportunity work environment requires, at a minimum, a level of clarity in Human Resource Management policy communication and consistency in policy practice and implementation that, unfortunately, was not met in this case.

[Filing No. 58-4 at 4-5.]

### C.     Discussion

In support of its Motion to Exclude, IU argues that Dr. Fairfield-Sonn's opinion regarding IU's alleged violation of accepted policies and procedures is inadmissible because it does not constitute reliable and helpful expert testimony.  [Filing No. 67 at 8-9.]  IU notes that Dr. Fairfield-Sonn does not identify any policy or procedure that the decisionmakers violated, and that whether Professor Palmer should have been given additional advice regarding seeking an early promotion and advancing his career is not the subject of the litigation – the subject is whether IU acted discriminatorily.  [Filing No. 67 at 9.]  IU asserts that Dr. Fairfield-Sonn's opinion that the advice not to seek an early promotion "was not completely in line with the [Lecturer Policy] and if he had sought the opinion of the Dean or his former Chair, he would have heard other contradictory counsel" offers no specialized knowledge and is pure speculation.  [Filing No. 67 at 9-11.]  As to Dr. Fairfield-Sonn's opinion that IU did not treat Professor Palmer fairly in comparison to Professor Gildea, IU argues that Dr. Fairfield-Sonn fails to identify any methodology he used to form his opinion, and that his opinion will not assist the jury.  [Filing No. 67 at 12-15.]  It further contends that Dr. Fairfield-Sonn's opinions regarding IU's assignment of office space and work environment are inadmissible because his "observations add nothing to the material issues in this case and do not constitute 'opinions'…."  [Filing No. 67 at 15-16.]  IU requests that the Court exclude Dr. Fairfield-Sonn's opinions from consideration when ruling on the Motion for Summary Judgment and from the jury's consideration at trial.  [Filing No. 67 at 16.]

In his response, Professor Palmer argues that IU's Motion to Exclude is a collateral motion that violates Local Rule 56-1(i), that the issue should have been raised as an objection in IU's reply brief in support of its Motion for Summary Judgment, and that the Motion to Exclude is being used to circumvent the page-limit for IU's reply brief.  [Filing No. 71 at 3.]  Professor Palmer also argues

that motions to strike evidence in summary judgment briefing are disfavored. [Filing No. 71 at 5-6.]  He contends that IU does not challenge Dr. Fairfield-Sonn's background or experience, and that IU focuses mainly on Dr. Fairfield-Sonn's factual bases and not his conclusions.  [Filing No. 71 at 6-8.]  Professor Palmer asserts that Dr. Fairfield-Sonn's opinions relate to whether Professor Palmer was disadvantaged compared to Professor Gildea, "which is directly relevant to whether a similarly situated comparator was treated more favorably and directly relevant to pretext." [Filing No. 71 at 8.]  Professor Palmer argues that courts commonly allow experts to testify regarding industry standards and whether the standards were followed, which is what Dr. Fairfield-Sonn is doing.  [Filing No. 71 at 10-11.] He asserts that IU disregarded Dr. Fairfield-Sonn's opinion about Professor Krishnan's advice to Professor Palmer relating to seeking an early promotion, and that his opinions about IU's treatment of Professor Palmer compared to its treatment of  Professor Gildea are admissible because it is proper for an expert to base opinions on personal knowledge and experience, Dr. Fairfield-Sonn is qualified, and he fully supported his opinions.  [Filing No. 71 at 13-23.]  Professor Palmer argues further that Dr. Fairfield-Sonn's opinions regarding salary inequities are admissible because he provided an adequate methodology and analysis.  [Filing No. 71 at 23-24.]  Finally, Professor Palmer argues that IU's disagreement with some of the facts set forth in Dr. Fairfield-Sonn's expert report is not a basis for excluding the report, and that Dr. Fairfield-Sonn's observations regarding the importance of an appropriate office space are relevant to his conclusion that IU did not treat Professor Palmer fairly and would be helpful to the jury. [Filing No. 71 at 24-27.]

In its reply, IU first argues that the Motion to Exclude was proper because it also seeks to exclude Dr. Fairfield-Sonn's opinions at trial, and that it would have been inefficient and a waste of judicial resources for IU to argue that Dr. Fairfield-Sonn's opinions were inappropriate both in

its reply brief in support of its Motion for Summary Judgment and in a Motion in Limine filed closer to trial. [Filing No. 73 at 2-3.] IU also argues that Professor Palmer relies on cases involving motions to strike non-expert declarations and not motions to exclude expert testimony. [Filing No. 73 at 5-6.] IU goes on to reiterate many of the arguments it made in its opening brief. [Filing No. 73 at 7-20.]

*1.     Procedural Appropriateness of the Motion to Exclude*

At the outset, the Court considers whether IU's Motion to Exclude was procedurally appropriate under the circumstances presented. Professor Palmer relies upon Local Rule 56-1(i) in arguing that the Motion to Exclude is procedurally improper. That rule provides:

> The court disfavors collateral motions – such as motions to strike – in the summary judgment process. Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief.

L.R. 56-1(i).

The Court finds that IU's filing of the Motion to Exclude does not violate Local Rule 56-1(i). IU specifically requests that Dr. Fairfield-Sonn's testimony be excluded from the jury's consideration at trial, distinguishing the motion from a request in summary judgment briefing that a certain piece of evidence be stricken. And the Court agrees with IU's point that, had IU only objected to the Court considering Dr. Fairfield-Sonn's testimony on summary judgment in its reply brief, it would have had to raise the issue again closer to trial, through a Motion in Limine. It is not unusual for a party to rely upon expert testimony in connection with a summary judgment motion or a response to the motion, and for the opposing party to object to that reliance and to file a motion to exclude the expert testimony both on summary judgment and at trial. *See, e.g.*, *Fromer v. Riggs*, 2019 WL 1416728 (S.D. Ind. 2019); *Levy v. Marion Cnty. Sheriff*, 2019 WL 535706 (S.D. Ind. 2019).

Moreover, IU did raise its objection to Dr. Fairfield-Sonn's testimony in its reply brief. [*See* Filing No. 65 at 7.]  And, even if it had not, denying the Motion to Exclude for procedural reasons – as Professor Palmer urges – would elevate form over function.  Professor Palmer had the opportunity to respond to IU's Motion to Exclude, did so by filing a 28-page response brief, and has not been prejudiced in any way by IU filing the Motion to Exclude contemporaneously with its reply brief in support of its Motion for Summary Judgment.  The Court declines to deny IU's Motion to Exclude on procedural grounds.

2.   *Substantive Issues*

Dr. Fairfield-Sonn's expert report boils down to the following conclusion:  IU treated Professor Palmer less favorably than Professor Gildea with respect to the timing of an early promotion review, the timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space.  [Filing No. 58-4 at 4-5.]  The Court discusses two issues that are dispositive of the Motion to Exclude – whether Dr. Fairfield-Sonn is qualified to render his opinion and whether his opinion would aid the trier of fact.

a.   Whether Dr. Fairfield-Sonn is Qualified

Federal Rule of Evidence 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education." Dr. Fairfield-Sonn has extensive experience as a member of the faculty at a business school – the Barney School of Business at the University of Hartford – and has served in several administrative positions there. [*See* Filing No. 58-4 at 3.] But Dr. Fairfield-Sonn has not demonstrated that he is qualified to testify regarding any type of industry-wide standards, to the extent such standards exist.  Nor does his experience at the Barney School of Business – a school that presumably has different policies and procedures than IU – qualify him to testify regarding IU's policies and procedures for promoting non-tenured faculty.

The Court finds that Dr. Fairfield-Sonn is not qualified to testify as an expert regarding IU's treatment of Professor Palmer.  Although the Court's inquiry could end here, it discusses the remaining relevant factors.

> b.   Whether Dr. Fairfield-Sonn's Testimony Would Aid the Trier of Fact

"Expert testimony is admissible only when it will assist the trier of fact, and fact-intensive findings are within lay competence and are the prerogative of the jury." *Aponte v. City of Chicago,* 2011 WL 1838773, at *3 (N.D. Ill. 2011). The Court acknowledges that it can be helpful in certain situations for an expert to testify regarding a defendant's legal duties. *See, e.g., Lees v. Carthage College,* 714 F.3d 516, 522 (7th Cir. 2013) ("Where the specifics of a defendant's duty of care involve specialized knowledge, plaintiffs must introduce expert testimony to establish this element of a …claim"). But this situation is unlike those where the standard a jury must apply is not defined by the law, but rather by a custom, practice, or even difficult-to-understand technology – for example, the standard of care a doctor must exercise, or the use of a state of the art device. Here, IU was required to follow a standard defined by the law, and the jury will receive instructions setting forth what that law is. Expert testimony regarding a standard defined by the law would encroach on the Court's role of instructing the jury on that issue. *S.E.C. v. Tourre,* 950 F.Supp.2d 666, 675 (S.D. N.Y. 2013) ("Expert testimony may not usurp the province of the judge to instruct on the law….").

Indeed, Dr. Fairfield-Sonn's opinion is even simpler in this case. He does not opine regarding whether IU violated some industry standard per se, but focuses instead on whether IU treated Professor Gildea more favorably than Professor Palmer. This is an issue of fact, which the jury must analyze and upon which the jury must reach a conclusion. Expert testimony is simply not necessary or appropriate. *Sullivan v. Alcatel-Lucent USA Inc.,* 2014 WL 3558690, at *6 (N.D.

Ill. 2014) ("Expert testimony does not assist the trier of fact when [it] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony").

Specifically, the jury would be required to determine whether IU treated Professor Palmer less favorably than Professor Gildea based on the promotions they were given, the salary each individual was paid, the teaching opportunities they were given, and the office space they were provided. This determination will be based on the facts presented to the jury, and expert testimony is not needed to aid the jury in making that determination. *See Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002) (testimony from human resources expert properly excluded where "the facts were not so complicated as to require the testimony of an expert witness on either the adequacy of the [sexual harassment] plan or policy or the investigation that followed") (quotation and citation omitted); *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir. 1980) (expert testimony excluded because the "question whether gender was the basis of differential treatment is not so technical as to require the aid of an expert to enlighten the jury or court").

Should the jury find favorable treatment was provided, the jury's ultimate question would be whether any favorable treatment IU gave Professor Gildea was related to race. To the extent Dr. Fairfield-Sonn will opine that IU treated Professor Palmer and Professor Gildea differently due to race, [*see* Filing No. 58-4 at 3 (Dr. Fairfield-Sonn stating that he examined the opportunities IU provided to Professor Palmer and Professor Gildea in order to determine whether the denials of opportunities to Professor Palmer "resulted in the University failing to equitably pay him based on his African American race")], such testimony would be impermissible. *Smith v. Colorado Interstate Gas Co.*, 794 F. Supp. 1035, 1044 (D. Colo. 1992) (expert testimony regarding gender and race discrimination excluded because "[g]ender and race discrimination are issues an average

person can evaluate and understand without the assistance of an expert," and an expert may not "impermissibly seek to direct the result [of the] case").

Put simply, even if he were qualified to testify as an expert in this case, Dr. Fairfield-Sonn's testimony would not aid the jury. A jury is perfectly capable of evaluating the evidence regarding promotions, salaries, teaching opportunities, and office space, and deciding which individual was treated better by IU. And any testimony that IU treated Professor Palmer different due to his race is impermissible as it is the ultimate question the jury must decide. The Court **GRANTS** IU's Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn. [Filing No. 66.]

### III.
#### PROFESSOR PALMER'S MOTION FOR LEAVE TO FILE SURREPLY

In his motion, Professor Palmer argues that he is entitled to address the following issues in a surreply: (1) IU's request that the Court strike the expert opinion of Dr. Fairfield-Sonn; (2) IU's objections to three demonstrative exhibits submitted by Professor Palmer; (3) IU's argument that Professor Palmer does not provide citations to the record to support a statement regarding teaching opportunities provided to him; and (4) IU's "new arguments," including that the Court should not consider certain public salary reports, that some of Professor Palmer's evidence is "self-serving," that evidence regarding office space assignments that occurred from 2017 to 2019 does not constitute evidence of pretext, and that some of Professor Palmer's evidence is irrelevant. [Filing No. 69 at 2-3.] Professor Palmer submits a 21-page surreply as an exhibit to his motion. [Filing No. 69-1.]

In its response, IU argues that it did not introduce new evidence or raise new arguments in its reply in support of its Motion for Summary Judgment, so a surreply is inappropriate. [Filing No. 72 at 1.] It asserts that its separate Motion to Exclude Dr. Fairfield-Sonn's expert opinion was proper, that Professor Palmer misconstrues IU's statements regarding the public salary reports, and

that a portion of Professor Palmer's proposed surreply is "an improper attempt to further develop the same arguments he has already made on whether [Professor] Gildea is a proper comparator." [Filing No. 72 at 2-8.]  IU contends that its argument related to office space is merely a response to the position Professor Palmer set forth in his response brief, and that Professor Palmer misconstrues IU's arguments regarding the evidence needed to prove a race discrimination claim. [Filing No. 72 at 8-10.]  Finally, IU argues that Professor Palmer improperly uses his proposed surreply to reiterate or expand upon some of his arguments.  [Filing No. 72 at 10-12.]

In his reply brief, Professor Palmer reiterates many of his initial arguments.  [Filing No. 74.]

Local Rule 56-1(d) provides that "[a] party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response.  The surreply…must be limited to the new evidence and objections."  The Court has already ruled on IU's Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn, so any discussion of that motion in Professor Palmer's proposed surreply is moot.  As to the other categories of argument which Professor Palmer seeks to address in his surreply, the Court finds as follows:

- IU's objection to three demonstrative exhibits: While the Court is not convinced that IU's arguments regarding the exhibits are really objections to their admissibility, as opposed to arguments regarding their significance, the Court will, out of an abundance of caution, consider Professor Palmer's arguments in his proposed surreply regarding that issue.

- IU's claim that Professor Palmer does not provide citations to the record to support certain arguments: This argument does not constitute new evidence nor an objection to the admissibility of evidence – the only categories for which a surreply is permitted under Local Rule 56-1(d).  The Court is perfectly capable of determining whether the parties have supported their various arguments by citation to the record, as required by Local Rule 56-1(e), and will not consider Professor Palmer's arguments in his proposed surreply on that issue.

- IU's "new arguments" regarding the public salary reports of Professor Palmer and Professor Gildea, evidence relating to their performance, Professor Palmer's burden of proof regarding his office space assignments evidence, and Professor Palmer's burden of proof regarding certain other evidence: Again, these arguments are not new evidence or objections to the admissibility of evidence, and a surreply is not permitted. The nature of a reply brief is that it addresses arguments made in the response brief, so it may discuss arguments no previously made in the opening brief. The existence of a new argument does not allow the non-movant to file a surreply. And the Court is capable of evaluating the arguments the parties have made, including whether certain evidence supports that party's claims and whether a party has sustained its burden of proof.

In sum, the Court **GRANTS IN PART** Professor Palmer's Motion for Leave to File Surreply, [Filing No. 69], to the extent that it will consider the arguments in Professor Palmer's proposed surreply, [Filing No. 69-1], which relate to IU's arguments regarding the three demonstrative exhibits. The Court **DENIES IN PART** Professor Palmer's Motion for Leave to File Surreply, [Filing No. 69], to the extent that it will not consider the other arguments in Professor Palmer's proposed surreply.

## IV.
### IU'S MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support

a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**B.    Discussion**

Professor Palmer bases his race discrimination claim on four alleged actions by IU:  (1) failure to promote him early; (2) failure to pay him an equitable salary; (3) failure to provide him with teaching opportunities in an equitable manner; and (4) failure to provide him with comparable office space.  The Court first sets forth the law applicable to Professor Palmer's Title VII claim, and then addresses each of his theories in turn.

### 1.    *Applicable Law*

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the…adverse employment action,'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)), and a plaintiff must provide such evidence in order to survive summary judgment, *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017).

A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent.  *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).  A plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]" "[t]o clarify and to simplify [his] task."  *Joll*, 953 F.3d at 929 (quotation and citation omitted).  The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Golla v. Office of Chief Judge of Cook Cnty.,*

*Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  In determining whether the evidence would permit a reasonable factfinder to conclude that Professor Palmer's race caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted).  But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 F. App'x 608, 610 (7th Cir. 2019).  "[A]ll evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Ill. Dept. of Fin. & Prof. Reg.*, --- F.3d ----, 2021 WL 613425, at *5 (7th Cir. 2021) (citation and quotation omitted).

Under the *McDonnell Douglas* framework, a plaintiff must "make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601-02 (7th Cir. 2020).  To make a prima facie case under *McDonnell Douglas*, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer. *Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 791-92 (7th Cir. 2020).

### 2.    *Failure to Promote Professor Palmer Early*

In support of its Motion for Summary Judgment, IU argues that Professor Palmer's claim based on a failure to promote him early is time-barred because he did not file his EEOC Charge until nearly six years after he was discouraged from seeking an early promotion.  [Filing No. 47 at

43

22.]  IU contends that Professor Palmer's February 10, 2019 email to Associate Dean Maines reported alleged discriminatory conduct related to his January 2013 early promotion conversation with Professor Krishnan, and shows that he knew of his early promotion claim at that time, yet did not file his EEOC Charge until May 15, 2019.  [Filing No. 47 at 22-23.]  IU further argues that Professor Palmer's claim based on a failure to promote fails because he did not apply for early promotion.  [Filing No. 47 at 30.]  It asserts that, even if Professor Krishnan discouraged him from applying, Professor Palmer still chose not to apply.  [Filing No. 47 at 31-32.]  Additionally, IU argues that Professor Gildea is not a proper comparator to Professor Palmer because, for example, Professor Gildea had taught over 90 credit hours in multiple courses for different programs by the time he applied for early promotion and Professor Palmer had only taught 48 credit hours, including only three undergraduate courses and one Kelley Direct course.  [Filing No. 47 at 32-33.]  Finally, IU argues that there is no evidence that Professor Palmer's race had anything to do with Professor Krishnan discouraging him from applying for early promotion, noting that Professor Krishnan believed that Professor Palmer needed to build his teaching record and stating that "[t]here is simply no evidence that [Professor] Krishnan did not honestly believe that [Professor] Palmer should add more data points to his dossier with respect to his teaching record and service contributions before applying for promotion."  [Filing No. 47 at 33-34.]

In response, Professor Palmer argues that his race discrimination claim based on a failure to promote should be equitably tolled because he "had no suspicion that the failure to promote him early was based at least in part on his race until his Caucasian comparator, [Professor] Gildea, was confirmed for early promotion on April 9, 2019," and that he then filed his EEOC Charge on May 14, 2019.  [Filing No. 54 at 31-32.]  He asserts that Professor Gildea is a proper comparator because he and Professor Gildea both had administrative appointments at the time of their consideration

for early promotion, that Professor Palmer's student evaluations were better than Professor Gildea's, and that both were judged by the same promotion criteria. [Filing No. 54 at 23-26.] Professor Palmer argues that IU "overlooks and downplays [his] qualifications and contributions to IU and ignores the numerous teaching opportunities and assistance it provided to [Professor] Gildea that it did not offer to [Professor] Palmer," and that "[d]iscrimination is at the root of the alleged superior qualifications IU argues that [Professor] Gildea had." [Filing No. 54 at 24.] Professor Palmer argues that IU "discounted" his role as Diversity Coach and the successes he achieved in that role, and that the Policy Statement on the Lecturer/Senior Lecturer Rank does not mention needing a minimum number of credit hours before early promotion is awarded. [Filing No. 54 at 24.] He relies on several demonstrative exhibits which show the breakdown of students in various academies including the BMA, a comparison of Professor Palmer's and Professor Gildea's compensation, and their Dean's 8 scores. [Filing No. 59-5 at 13-15.] Professor Palmer also notes that both he and Professor Gildea won numerous teaching awards in their first three years as lecturers. [Filing No. 54 at 25.] Professor Palmer argues that IU offered Professor Gildea more teaching opportunities than Professor Palmer, so it cannot rely on Professor Gildea's teaching experience to argue that Professor Gildea is not a proper comparator. [Filing No. 54 at 25.] As for IU's argument that Professor Palmer never applied for the promotion, Professor Palmer argues that meeting with Professor Krishnan and being discouraged from applying constituted applying and being rejected, and that even if he did not formally apply, he is not required to show this element because IU's discriminatory practices deterred him from applying. [Filing No. 54 at 26-28.] Finally, Professor Palmer argues that a reasonable jury could find that IU's behavior was pretextual because his achievements were ignored or understated, every other senior lecturer in the Marketing Department was treated more favorably with office space assignments, overload

45

teaching opportunities and an opportunity to teach overseas were not given to Professor Palmer, Dean Kesner "made multiple, unsupported assertions in an effort to justify IU's discriminatory conduct towards [Professor] Palmer" in her deposition, and Professor Burke and Professor Krishnan "offer post hoc reasons for treating [Professor] Palmer differently." [Filing No. 54 at 29-31.]

In its reply, IU again argues that Professor Palmer's May 14, 2019 EEOC Charge was untimely, pointing to Professor Palmer's August 10, 2018 email to Associate Dean Maines in which he detailed how racial discrimination had impacted his ability to earn an early promotion, and to Professor Palmer's February 10, 2019 email in which he acknowledges that Professor Gildea is going up for early promotion. [Filing No. 65 at 3-5.] IU reiterates its argument that Professor Palmer did not apply for early promotion, and contends that it is undisputed that faculty members are not required to have the department chair's approval to seek early promotion, and that the procedure to follow in order to apply was clearly set out, but Professor Palmer chose not to follow it. [Filing No. 65 at 5-6.] IU argues that Professor Palmer has not explained how Professor Krishnan's advice regarding early promotion deviated from an IU policy or was related to Professor Palmer's race. [Filing No. 65 at 7.] IU asserts that Professor Gildea had "very different responsibilities and a more extensive workload than [Professor] Palmer," making him an improper comparator. [Filing No. 65 at 9.] It also notes that Professor Gildea and Professor Palmer had different supervisors, that Professor Palmer's belief that he had superior qualifications to Professor Gildea is irrelevant, and that he has not presented any evidence that IU's treatment of him was related to his race. [Filing No. 65 at 10-11.] As for teaching opportunities, IU notes that Professor Gildea and Professor Palmer had experience in different areas, and that a different person was

responsible for assigning their courses.  [Filing No. 65 at 12.]  Finally, IU argues that Professor Palmer has not presented any evidence of pretext.  [Filing No. 65 at 13-17.]

a.   <u>Timeliness of EEOC Charge</u>

In order for Professor Palmer to bring claims under Title VII in federal court, he must have: (1) timely filed a charge with the EEOC, and (2) received a right to sue letter from the EEOC.  *See* 42 U.S.C. § 2000e-5(b), (e), and (f).  To meet the timeliness requirement, a plaintiff must file a charge with the EEOC within 180 days of the allegedly discriminatory act, *id.*, or within 300 days "if a [plaintiff] initially institutes proceedings with a state or local agency that possesses the authority to address the alleged discrimination," *Russell v. Delco Remy Div.*, 51 F.3d 746, 750 (7th Cir. 1995).  This deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past."  *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 291 (7th Cir. 1986) (internal quotation and citation omitted).  Where the alleged discriminatory act is not immediately discovered, a plaintiff must file the EEOC Charge within a reasonable time.  *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995).

Professor Palmer and Professor Krishnan discussed the possibility of Professor Palmer's early promotion in January 2013.  [Filing No. 46-12 at 23-24; Filing No. 46-14 at 1.]  Professor Palmer first raised his concerns about Professor Gildea's early promotion in the summer of 2018 during a conversation with Professor Burke, [Filing No. 46-1 at 37], and then again in an August 10, 2018 phone conversation with Associate Dean Maines, [Filing No. 46-10 at 30].  In a February 10, 2019 email to Associate Dean Maines, Professor Palmer referenced the August 10, 2018 phone conversation, and reiterated his concerns regarding "how racial discrimination had negatively impacted [his]…promotion to senior lecturer."  [Filing No. 46-26 at 1-2.]  In the February 10, 2019

email, Professor Palmer specifically mentioned Professor Gildea "going up for promotion nearly 3 full years earlier than I was allowed." [Filing No. 46-26 at 1-2.]

Professor Palmer's race discrimination claim for failure to promote him early accrued in January 2013, when he alleges that Professor Krishnan – whose support he believed he needed for an early promotion – discouraged him from applying. *Thelen*, 64 F.3d at 267 ("A plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful"). The deadline for filing the EEOC Charge may be equitably tolled where "despite all due diligence, he is unable to obtain enough information to conclude that he may have a discrimination claim." *Id.* (citing *Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)). Giving Professor Palmer every benefit of the doubt, it is clear that he had concluded that he may have a discrimination claim by August 10, 2018, when he discussed the early promotion issue with Associate Dean Maines. This is confirmed by his February 10, 2019 email to Associate Dean Maines, in which he stated that during their August 10, 2018 phone call, he had "outlined to you that I had a number of significant concerns regarding racial discrimination and/or bias by IU and [Professor Krishnan]…against me," and had "detailed for you how racial discrimination had negatively impacted my…promotion to senior lecturer."[5] [Filing No. 46-26 at 1-2.] The Court finds that by his August 10, 2018 phone conversation with Associate Dean Maines, Professor Palmer had

---

[5] Professor Palmer argues that he did not know racial discrimination had occurred until Professor Gildea actually received his promotion, on April 9, 2019. [Filing No. 54 at 32.] But this is directly contradicted by Professor Palmer's own words in his February 10, 2019 email to Associate Dean Maines. [Filing No. 46-26 at 1-2 ("During the [August 10, 2018] call, I detailed for you how racial discrimination had negatively impacted my…promotion to senior lecturer….").] It is disingenuous for Professor Palmer to argue that he had not concluded that he might have a race discrimination claim related to early promotion until Professor Gildea was actually promoted, given that he specifically mentioned such a claim in his February 10, 2019 email (and in his August 10, 2018 phone call with Associate Dean Maines).

concluded that he may have a discrimination claim related to Professor Krishnan's advice not to seek early promotion.

Professor Palmer ultimately filed his EEOC Charge on May 15, 2019, more than nine months after the August 10, 2018 phone conversation with Associate Dean Maines.  Professor Palmer did not have a new 300 days in which he had to file his EEOC Charge, but rather needed to do so "within a reasonable time," which the Seventh Circuit Court of Appeals has defined as "days, and at most weeks." *Thelen*, 64 F.3d at 268.  Professor Palmer does not provide any explanation for why he waited over nine months to file his EEOC Charge, and the Court finds that this time period was not reasonable and that his EEOC Charge related to his early promotion claim was not timely.  Accordingly, his race discrimination claim based on his early promotion theory is time barred.

b.    <u>Merits of Early Promotion Claim</u>

But even if his EEOC Charge were timely, Professor Palmer's race discrimination claim fails for additional reasons.

i.    **Failure to Apply for Promotion**

In the failure-to-promote context, a plaintiff must produce evidence demonstrating that: "(1) [he] was a member of a protected class; (2) [he] was qualified for the position sought; (3) [he] was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Comm. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016).  The requirement that the plaintiff must have applied for the position sought may be relaxed where "a plaintiff is deterred from applying by the very discriminatory practices he is protesting." *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994); *see also Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 385 (7th Cir. 2016) ("[A]n application is unnecessary when

49

a plaintiff can show [he] would have applied had it not been for the complained-of discriminatory practices").

Here, Professor Palmer alleges that he did not continue with the process for applying for early promotion because Professor Krishnan did not support him, and that Professor Krishnan's lack of support was discriminatory. What is lacking, however, is any evidence that Professor Krishnan's lack of support for Professor Palmer had anything to do with his race. As Professor Krishnan testified, he discouraged Professor Palmer from applying for an early promotion because early promotion was rare, he believed that Professor Palmer needed more teaching experience so that he would have more data points for the department to consider, and he believed that Professor Palmer should become more visible in the Marketing Department as Diversity Coach and through other service activities. Professor Palmer bases his failure-to-promote claim on the fact that Professor Gildea received an early promotion over six years later and that – by Professor Palmer's account – he was more qualified than Professor Gildea when he sought Professor Krishnan's advice regarding early promotion. Again, though, there is simply no evidence that Professor Krishnan's advice to Professor Palmer had anything whatsoever to do with his race. Because Professor Palmer has not provided evidence that Professor Krishnan's advice to him regarding early promotion was discriminatory, the Court finds that Professor Palmer's failure to formally apply for early promotion is fatal to his claim.

### ii.    Improper Comparator

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quotation and citation omitted). The requirement that a comparator

be similarly situated to the plaintiff "eliminate[s] other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quotation and citation omitted).  A similarly situated employee "need not be identically positioned," *Igasaki*, 2021 WL 613425, at *6, but they "must be 'directly comparable' to the plaintiff 'in all material respects,'" *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610-11 (7th Cir. 2006)).

Considerations for promotion to senior lecturer include, for example, the quality of teaching, the quality of service to IU in support of teaching, evidence of peer observation and evaluation of teaching, receipt of teaching awards, participation in the leadership and development of IU, participation in curriculum development and innovation, and development of new course and teaching materials.  [Filing No. 46-13 at 6-7.]  Professor Palmer and Professor Gildea possessed different qualifications at the three-year mark of their employment with IU.

- Professor Gildea had taught over 90 credit hours of ten different courses in several different subject areas in the undergraduate, residential MBA, and online Kelley Direct programs; Professor Palmer had taught 48 credit hours of three undergraduate courses and one Kelley Direct course.

- Professor Gildea was the Director of the BMA, which involved a level of responsibility normally given to a clinical faculty member; Professor Palmer was the Diversity Coach, which did not involve that level of responsibility.

- Professor Gildea had experience in business-to-busines marketing when he joined IU, which qualified him to teach courses in that area and to direct the BMA; Professor Palmer had experience in consumer marketing.

- Professor Gildea was not prohibited from teaching certain types of classes on an overload basis; Professor Palmer could not teach certain classes on an overload basis because of his position as Diversity Coach.

- When Professor Palmer sought early promotion, Professor Burke had assigned academic courses for the years immediately preceding that time; Professor Krishnan assigned courses for the years relevant to Professor Gildea's early promotion.

Given that Professor Palmer and Professor Gildea differed in the very factors which were considered for early promotion, the playing field was not level such that a difference in treatment could support a claim of discrimination.[6] Professor Palmer's race discrimination claim based on his failure to be promoted in 2016 fails for the additional reason that Professor Gildea is not a sufficiently similar comparator.[7]

### iii.   Evidence of Pretext

Even assuming that Professor Palmer could make out a prima facie case of race discrimination based on a failure to promote him in 2016, he must then present evidence that the reasons Professor Krishnan offers for discouraging him from applying for early promotion are pretextual. Again, Professor Krishnan testified that he discouraged Professor Palmer from applying for an early promotion because he felt that Professor Palmer did not have enough teaching experience, and that additional time would allow Professor Palmer to garner more evaluations and

---

[6] IU argues that Professor Krishnan was the chair of the Marketing Department when Professor Palmer sought advice regarding early promotion, but that Professor Burke was the chair of the Marketing Department when Professor Gildea was promoted. This difference is immaterial, as the crux of Professor Palmer's claim relates to the advice Professor Krishnan provided. When Professor Gildea sought advice regarding early promotion, Professor Krishan was still the department chair, and advised him that his experience was "lining up with the requirements" for early promotion. [Filing No. 60-3 at 13-14.] That Professor Burke became the department chair shortly thereafter is irrelevant to Professor Palmer's claim.

[7] Professor Palmer argues at times that he was more, or as, qualified for early promotion than Professor Gildea, but also argues that if he was less qualified, it was because IU discriminated against him by providing him with fewer opportunities than Professor Gildea. However, he has not provided any evidence that race had anything to do with the opportunities he was presented with by IU prior to the time he inquired about early promotion.

"data points" for faculty to evaluate.  Professor Krishnan also thought that additional time would allow Professor Palmer to build his presence in the Marketing Department through his position as Diversity Coach, and to be involved in additional service activities.  Professor Palmer has not presented any evidence that Professor Krishnan really prevented him from applying for early promotion due to his race.  This lack of evidence of pretext is another reason why Professor Palmer's failure-to-promote claim fails.[8]

Professor Palmer's race discrimination claim based on a failure to promote him in 2016 fails as a matter of law because Professor Palmer did not timely file his EEOC Charge related to that claim, he did not apply for early promotion, Professor Gildea is not a similarly situated comparator, and Professor Palmer has not provided any evidence that Professor Krishnan's reasons for discouraging Professor Palmer from applying for an early promotion were pretextual.  The Court **GRANTS** IU's Motion for Summary Judgment on Professor Palmer's failure-to-promote claim.

### 3.    *Pay Inequities*

The Court notes at the outset that in his response brief, Professor Palmer clarified that his pay inequity claim is limited to the pay he received from May 2017, forward.  [Filing No. 54 at 33.]  Accordingly, the Court only considers the parties' arguments that are related to this time period.

In support of its Motion for Summary Judgment, IU argues that it is undisputed that Professor Palmer has always been paid the highest base salary of any lecturer or senior lecturer in

---

[8] As set forth above, the Court has considered Professor Palmer's surreply as it relates to the demonstrative exhibits upon which he relies to support his failure-to-promote claim.  [Filing No. 69-1 at 16-18 (discussing Filing No. 59-5 at 13-15).]  Even considering the demonstrative exhibits, however, Professor Palmer has not provided evidence of pretext.

the Marketing Department since he was hired.   [Filing No. 47 at 24.]  IU acknowledges that Professor Palmer's pay inequity claim is based on the percentage of pay raises he received, and asserts that Professor Krishnan recommended that Professor Gildea receive higher percentage raises for the 2017-18 and 2018-19 academic years because he was the director of the BMA and "had transformed it into the largest academy in the MBA program," and he had taught classes in the residential MBA, online Kelley Direct, and undergraduate programs "with consistently strong performance." [Filing No. 47 at 27.]  For these reasons, IU argues, Professor Gildea is not a proper comparator to Professor Palmer because Professor Palmer mainly taught in the undergraduate program and did not have any leadership positions within the Marketing Department or the KSOB. [Filing No. 47 at 27.]  IU acknowledges that Professor Gildea received the highest percentage raise of any faculty member, but that "salary raises in the last ten years have typically ranged from between 1% and 2.5%." [Filing No. 47 at 28.]  Lastly, IU argues that Professor Palmer has not provided any evidence that discrimination played a role in the salary decision.  [Filing No. 47 at 29-30.]

In response, Professor Palmer argues that his pay equity claim is based on "the compensation that [Professor] Gildea and [Professor] Palmer made during the same years." [Filing No. 54 at 34.]  He notes that he made $3,300 less than Professor Gildea in 2017, $86,375 less in 2018, and $82,056 less in 2019. [Filing No. 54 at 34.]  Professor Palmer asserts that, even factoring out the $30,000 per year that Professor Gildea earned in 2018 and 2019 for his position at BMA, IU still paid Professor Gildea $111,731 more than him from 2017 to 2019.  [Filing No. 59 at 34.]  He contends that IU did not have a mathematical formula for determining raises, and that the Marketing Department's numerical reviews of faculty members did not always yield commensurate raises.  [Filing No. 54 at 34-35.]  Professor Palmer argues that Professor Gildea's

raises were "completely outside the norm and without explanation in any documentation at the time [they] were given," that Professor Krishnan's post hoc justifications for Professor Gildea's raises were not referenced when the raises were given, and that Professor Palmer had a lighter load due to IU's discrimination.  [Filing No. 54 at 35-36.]

In its reply, IU reiterates its argument that Professor Gildea it not a proper comparator. [Filing No. 65 at 17-18.]  As for its procedure for determining raises, IU notes that the numerical reviews of faculty are but one factor that is considered.  [Filing No. 65 at 19.]  IU argues that Professor Krishnan's explanations for Professor Gildea's raises in 2017-18 and 2018-19 expand on the short comments he added to a spreadsheet at the time the raises were given.  [Filing No. 65 at 20.]  Finally, IU argues that there is no evidence that the decisions regarding Professor Palmer's raises were based in any way on race.  [Filing No. 65 at 20.]

The following table reflects the compensation that Professor Palmer and Professor Gildea earned in the 2017-18, 2018-19, and 2019-20 academic years, and the percentage increases from the previous year:

|  | **Professor Palmer** | **Professor Gildea** |
|---|---|---|
| **2017-18** | $96,750 base salary (1.3% raise)<br><br>$141,000 total salary[9] | $86,500 base salary (4.8% raise)<br><br>$144,300 total salary |
| **2018-19** | $98,750 base salary (2.07%)<br><br>$127,550 total salary | $94,000 base salary (8.67% raise)<br><br>$213,925 total salary |

---

[9] Neither party clearly explains the difference between the base salary and the total salary numbers for Professor Palmer and Professor Gildea, but the Court concludes that amounts earned above base salary came from teaching awards, stipends, and overflow teaching.  The issue of overflow teaching opportunities is discussed below.

| | | |
|---|---|---|
| **2019-20** | $100,885 base salary (2.16%) + $8,000 base salary<br><br>$133,304 total salary | $103,400 (8.7% raise)<br><br>$215,360 total salary |

While Professor Palmer had a higher base salary than Professor Gildea up until the 2019-20 academic year, it is undisputed that Professor Gildea received higher percentage raises each of the three years at issue. Again, however, the Court finds that Professor Gildea is not an appropriate comparator. Professor Gildea held an administrative position during those three years, and Professor Palmer did not. Moreover, the administrative position was a significant one, as head of the BMA. Professor Krishnan, who was involved in setting Professor Gildea's salary raises for the 2017-18 and 2018-19 academic years, determined that the raises were appropriate because Professor Gildea "had transformed [the BMA] into the largest academy in the MBA program." [Filing No. 46-9 at 5.][10] While Professor Palmer had held the position of Diversity Coach, he had resigned by the time the 2017-18 academic year started. Moreover, Professor Gildea taught classes in the residential MBA program, the online Kelley Direct program (in which he taught the core marketing class), and undergraduate classes "with consistently strong performance." [Filing No. 46-9 at 5.] While Professor Palmer also received excellent teaching evaluations, he taught mainly in the undergraduate program, in addition to two online Kelley Direct elective courses. [Filing No. 46-9 at 5.] Professor Palmer's own belief that he was as qualified as Professor Gildea, and

---

[10] Professor Palmer seeks to discount Professor Krishnan's Declaration, in which he explains why he recommended the salary raises that Professor Gildea ultimately received, arguing that at the time he recommended the raises, Professor Krishnan only stated in documentation provided to Associate Dean Maines "Great start to teaching, leader BMA, likely to go up for promotion 2018-19 cycle." [Filing No. 54 at 35.] The Court finds this argument puzzling. Of course, Professor Krishnan was entitled to elaborate in his Declaration on his reasons for recommending Professor Gildea's raises. And that elaboration is entirely consistent with the notations on the documentation he provided to Associate Dean Maines at the time.

should have been paid commensurately, is unavailing. *See Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996) (an employee's "own opinions about his qualifications [do not] give rise to a material factual dispute").

In any event, even if Professor Gildea were a sufficient comparator, there is simply no evidence that Professor Krishnan's reasons for giving Professor Gildea higher percentage raises are pretextual. This Court "does not act as a superpersonnel department." *Milligan-Grimstad*, 877 F.3d at 710 (internal quotation omitted). Instead, it looks only to whether IU's explanation for giving Professor Gildea higher percentage raises is supported by legitimate reasons, and not at whether it was the best decision. *See David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 229 (7th Cir. 2017) ("Our role…is not to inquire into the wisdom of an employment decision, but simply to determine if the employer is dissembling to cover up a discriminatory purpose"); *Coleman*, 667 F.3d at 852 ("[T]he only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie") (quotation and citation omitted); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("[I]t is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"). Professor Palmer simply has not provided any evidence that IU's reasons for giving Professor Gildea higher percentage raises were a pretext for race discrimination. Accordingly, Professor Palmer's race discrimination claim related to pay inequity fails as a matter of law and IU's Motion for Summary Judgment on that claim is **GRANTED**.

4.      *Teaching Opportunities*

While perhaps not technically a separate basis for Professor Palmer's race discrimination claim, the Court notes that Professor Palmer insinuated throughout his briefing that if IU viewed him as having inferior qualifications due to teaching fewer courses, that was a result of IU discriminating against him due to his race by not offering him additional teaching opportunities. This theme is woven throughout Professor Palmer's arguments, and the Court finds it appropriate to discuss this separate theory briefly.

IU notes in its Motion for Summary Judgment that Professor Palmer expressed interest on one occasion in creating a course for the Kelley Direct Program, but did not make any additional requests to the Marketing Department chair regarding adding courses to his teaching load, and that he lived in Cleveland, Ohio and was on campus only three days per week, which affected the courses he was offered to teach. [Filing No. 47 at 5.] IU also explains that Professor Palmer was only permitted to teach 12 credits of overload courses while he was Diversity Coach, a position he held until the 2017-18 academic year, and could only teach Kelley Direct Program courses on an overload basis. [Filing No 47 at 5-6.]

Professor Palmer argues that he was denied Kelley Direct overload courses "[o]n multiple occasions," [Filing No. 54 at 11], and that teaching Kelley Direct classes did not require his presence on campus, [Filing No. 54 at 31].

In its reply, IU contends that Professor Gildea is not a proper comparator because he and Professor Palmer had different areas of expertise. [Filing No. 65 at 12.]

Again, the Court finds that Professor Gildea is not a proper comparator. Professor Gildea's expertise was in business-to-business marketing, while Professor Palmer had experience in consumer marketing. Professor Palmer was restricted to teaching only 12 overload credits in the

Kelley Direct Program.  Professor Gildea had no such restriction.  And, in any event, even if Professor Gildea were a proper comparator, Professor Palmer has presented no evidence that his course assignments were in any way a product of race discrimination.  To the extent that his race discrimination claim is based on the teaching opportunities that IU provided to him, no reasonable jury could conclude that his course assignments were a result of race discrimination and the Court **GRANTS** IU's Motion for Summary Judgment on that claim.

### 5.    *Office Space*

Finally, IU argues in support of its Motion for Summary Judgment that Professor Palmer's race discrimination claim based on office space assignments is time-barred because Professor Palmer first complained about office space in an August 7, 2018 email to Associate Dean Maines. [Filing No. 47 at 22-23.]  It notes that, as Diversity Coach, Professor Palmer had a private, interior office in the building housing the MBA program from his hire to the end of the 2016-17 academic year, and also had an office that he shared with another faculty member in the Marketing Department from his hire until the building housing the Marketing Department was renovated. [Filing No. 47 at 35.]  When the renovation was complete, IU states, Professor Palmer was given a cubicle in the building housing the Marketing Department so that he could still have space in that area in addition to his private office in the building housing the MBA program.  [Filing No. 47 at 35.]  IU explains that when Professor Palmer resigned as Diversity Coach, there were no available private offices in the building housing the Marketing Department but Professor Palmer still had a cubicle there, could use collaboration rooms for a private meeting space, was given permission to use another colleague's office, and was given his own private office in the building housing the Marketing Department as soon as one became available.  [Filing No. 47 at 35.]  IU's argues that the office space situation, while an inconvenience, was not an adverse employment

59

action, and that there is no evidence that Professor Palmer's race had anything to do with his office assignments.  [Filing No. 47 at 35-36.]

In response, Professor Palmer does not address IU's timeliness argument, but asserts that Associate Dean Maines admitted that offices were available in the building housing the Marketing Department between the Fall of 2017 and the Summer of 2019, but just were not available to Professor Palmer.  [Filing No. 54 at 14.]  He asserts that Professor Gildea was provided an office with a window upon his hire in 2018, that "[a]ll other senior lecturers and [Professor] Gildea had an office for a 2-year period that [Professor] Palmer had a small cubicle that did not even allow enough space for meetings with students or guest speakers," and that "[e]ven a graduate student was assigned an office while [Professor] Palmer was not."  [Filing No. 54 at 30.]

IU reiterates its arguments in its reply brief.  [Filing No. 65 at 14-15.]

Professor Palmer's race discrimination claim based on office space assignments fails for several reasons.  First, Professor Palmer does not respond to IU's argument that this claim is time-barred, so he has waived any opposition to that argument.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims").  In any event, Professor Palmer's claim related to office space assignments is time-barred.  Professor Palmer first complained regarding his office space assignment compared to Professor Gildea's assignment in an August 10, 2018 phone conversation with Associate Dean Maines.  They discussed the issue

again on October 17, 2018, and in his February 10, 2019 email, Professor Palmer specifically mentioned that during the October 17, 2018 conversation he had set forth "how racial discrimination had negatively impacted my…office space allocation." [Filing No. 46-26 at 1-2.] Yet, as with his claim regarding early promotion, Professor Palmer did not file his EEOC Charge until May 15, 2019 – well after the deadline for doing so, and also outside a reasonable timeframe after the deadline had passed.

Second, Professor Palmer does not respond to IU's argument that the office assignments were not adverse employment actions, and has waived any opposition to that argument. *Bonte, 624 F.3d at 466.* And the Court finds that the office space assignments do not constitute adverse employment actions – a necessary element of Professor Palmer's race discrimination claim. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("[N]ot everything that makes an employee unhappy is an actionable adverse action"); *Brownlee v. Catholic Charities of the Archdiocese of Chi.*, 2021 WL 269824, at *22 (N.D. Ill. 2021) (moving plaintiff from private office to cubicle did not constitute adverse employment action); *Hubers v. Gannett Co., Inc.*, 2019 WL 1112259, at *6 (N.D. Ill. 2019) (not being provided with an office was not an adverse employment action).

Finally, Professor Palmer's race discrimination claim based on office space assignments fails because he has not presented any evidence that race had anything to do with the assignments. To the contrary, the evidence indicates that the circumstances and physical office space constraints dictated the assignments. Initially, Professor Palmer had an office in the building housing the MBA program through his role as Diversity Coach, in addition to a cubicle in the building housing the Marketing Department. When he resigned as Diversity Coach, he still had a cubicle in the building housing the Marketing Department due to limitations on office availability, but had access

to collaboration rooms and a colleague's office space. To the extent Professor Palmer relies upon the office space assignments as evidence of pretext to support his other race discrimination claims, it is not. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) ("[Plaintiff] argues that only he had the laundry list of negative experiences and that he was the only African-American foreman in the department, which he suggests should be enough to show that people outside his protected class received systematically better treatment, [but] the experiences [plaintiff] has identified do not point directly to a discriminatory reason for the employer's action") (quotation and citation omitted)). There is simply no evidence that IU's rationale for not providing Professor Palmer with a private office until it finally did so was pretextual or that the office space assignments had anything to do with race. The Court **GRANTS** IU's Motion for Summary Judgment on Professor Palmer's race discrimination claim related to office space assignments.

## V.
### CONCLUSION

Professor Palmer's race discrimination claim for failure to promote was not pursued on a timely basis. Even if it had been, the claim is premised on Professor Palmer's personal assessment that he was as qualified, or more qualified, than Professor Gildea, and that IU treated Professor Gildea more favorably. His claims for disparate pay and teaching opportunities are similarly grounded. But the fact that Professor Palmer is African American and Professor Gildea is white is not enough to show that IU discriminated against Professor Palmer because of his race. *Cole,* 838 F.3d at 900 ("Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus"). Among other deficiencies with Professor Palmer's claims, there is no evidence that IU's justifications for its decisions – whether they were the right or best decisions – had anything to do with race. Finally, his claim for inequity in office assignments fails to state a claim. For the

reasons discussed above, the Court **GRANTS** IU's Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn, [66], **GRANTS IN PART** and **DENIES IN PART** Professor Palmer's Motion for Leave to File Surreply and Supplemental Designation of Evidence In Opposition to Defendant's Motion for Summary Judgment, [69], as set forth above, and **GRANTS** IU's Motion for Summary Judgment, [46]. Final judgment shall enter accordingly.

Date: 3/10/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**