# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

May 6, 2022

To:  Roger A. G. Sharpe
UNITED STATES DISTRICT COURT
Southern District of Indiana
United States Courthouse
Indianapolis, IN 46204-0000

| | |
|---|---|
| No. 21-1634 | PAUL PALMER, JR., II,<br>    Plaintiff - Appellant<br><br>v.<br><br>INDIANA UNIVERSITY and TRUSTEES OF INDIANA UNIVERSITY,<br>    Defendants - Appellees |
| **Originating Case Information:** | |
| District Court No: 1:19-cv-04610-JMS-MJD<br>Southern District of Indiana, Indianapolis Division<br>District Judge Jane Magnus-Stinson | |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                                No record to be returned

form name: **c7_Mandate**   (form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

April 14, 2022

CERTIFIED COPY

Before

JOEL M. FLAUM, *Circuit Judge*
FRANK H. EASTERBROOK, *Circuit Judge*
THOMAS L. KIRSCH II, *Circuit Judge*

| No. 21-1634 | PAUL PALMER, JR. II, Plaintiff - Appellant<br><br>v.<br><br>INDIANA UNIVERSITY and The TRUSTEES OF INDIANA UNIVERSITY, Defendants - Appellees |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:19-cv-04610-JMS-MJD<br>Southern District of Indiana, Indianapolis Division<br>District Judge Jane Magnus-Stinson ||

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

form name: c7_FinalJudgment    (form ID: 132)



In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 21-1634

PAUL PALMER, JR. II,

*Plaintiff-Appellant*,

v.

INDIANA UNIVERSITY
and THE TRUSTEES OF INDIANA UNIVERSITY,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-04610 — **Jane Magnus-Stinson,** *Judge*.

_____

ARGUED DECEMBER 2, 2021 — DECIDED APRIL 14, 2022

_____

Before FLAUM, EASTERBROOK, and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Paul Palmer, Jr. II, sued his employer Indiana University and its trustees (collectively IU) under Title VII of the Civil Rights Act of 1964, alleging discrimination based on his race. Palmer, who is African American, claimed that IU violated Title VII in two ways: (1) by failing to provide him an early promotion and (2) by paying him less than one of his white colleagues.

The district court granted summary judgment to IU. We affirm. Palmer's failure-to-promote claim is time-barred. And his unequal pay claim fails on the merits. The undisputed evidence shows Palmer enjoyed higher pay than all of his colleagues, except for one, who is not a proper comparator.

## I

### A

Indiana University hired Paul Palmer, Jr. II, as a lecturer in the Kelley School of Business Marketing Department in August 2010. A few years later in January 2013, during his third year as a lecturer, Palmer inquired to his Department Chair, Professor Hari Shanker Krishnan, about his potential for early promotion to senior lecturer. Krishnan said that it was rare for lecturers to apply for senior lecturer prior to their sixth year and suggested that Palmer wait. Palmer opted not to apply for early promotion after that conversation. In August 2016, IU promoted Palmer to senior lecturer on the traditional six-year timeline.

In addition to his role as a lecturer, IU had hired Palmer to serve as Diversity Coach in the MBA program. This administrative position paid an additional $25,000 per year and permitted Palmer to teach a reduced course load. By February 2017, IU had decided that the Diversity Coach position should focus more heavily on recruiting, and, that same month, Palmer sent an email saying, "I am not the person who should be responsible for driving diversity recruiting at the [Kelley School of Business], nor am I interested in being the person." In turn, Palmer decided to resign from his position as Diversity Coach effective at the end of the 2016–2017 school year,

Case 1:19-cv-04610-JMS-MJD   Document 83   Filed 05/06/22   Page 5 of 18 PageID #: 1640
Case: 21-1634   Document: 00713995989   Filed: 05/06/2022   Pages: 16   (5 of 18)

No. 21-1634                                                                      3

which resulted in Palmer losing his benefits from the position going forward, including the teaching credit and the stipend.

In August 2016, the Marketing Department hired Josh Gildea, who is white, as a new lecturer. Alongside his role as lecturer, Gildea was hired as Director of the Business Marketing Academy (the BMA). For this administrative position, Gildea earned a $30,000 annual stipend, plus a $7,500 annual summer stipend, but did not also receive a teaching credit.

On July 19, 2018, Palmer emailed the Chair of the Marketing Department, now Professor Ray Burke (Krishnan's successor), complaining about the fact that Gildea's base salary had risen to nearly match Palmer's base salary. At the time, Palmer earned $98,750 and Gildea earned $94,000, with no other lecturer or senior lecturer in their department earning over $90,000. Though Palmer was still the highest paid in the department at this time, his email to Burke said that Gildea's salary increase "from a URM [under-represented minority] perspective … looks very biased."

A few weeks later on August 7, 2018, Palmer emailed Associate Dean Laureen Maines sharing his belief that "there [were] a number of situations where [Krishnan] ha[d] been actively biased and/or discriminated against [Palmer] as an under-represented US minority." On August 8, Palmer followed up in a response email reiterating his concerns that he had "a number of issues over the last 5 years, where I feel [Krishnan] has acted in a … discriminatory manner against me." On August 10, 2018, Palmer and Maines spoke on the phone. During that call, Palmer repeated his concerns about Gildea's pay. Palmer also discussed how Krishnan had advised Palmer not to apply for an early promotion in 2013.

Case 1:19-cv-04610-JMS-MJD Document 83 Filed 05/06/22 Page 6 of 18 PageID #: 1641
Case: 21-1634 Document: 00713999983 Filed: 05/06/2022 Pages: 16 (6 of 18)

4 No. 21-1634

On February 8, 2019, Burke announced that Gildea was seeking an early promotion to senior lecturer. By that point, Gildea had taught more than five years' worth of credits (as measured by a normal credit load) and had grown the BMA into the largest academy in the MBA program.

On February 10, 2019, Palmer sent another email to Maines, reiterating his concerns: "On August 10, we met via phone, where I outlined to you that I had a number of significant concerns regarding racial discrimination and/or bias by IU and [Krishnan] (as my department chair) against me." Palmer's email said that "[d]uring the call," he had detailed for Maines "how racial discrimination had negatively impacted" his salary and promotion to senior lecturer. He also expressed his frustration with Gildea's consideration for early promotion: "Now I receive an email that Josh Gildea, the non-minority, significantly junior colleague is going up for promotion nearly 3 full years earlier than I was allowed … Early in my tenure at IU, I had asked [Krishnan] about going up for promotion early as well and was discouraged by him from doing so."

Throughout his time as a lecturer and senior lecturer at IU, Palmer earned the highest base salary of any lecturer or senior lecturer in the Marketing Department. But Palmer earned less in aggregate than Gildea between 2017 and 2019. In sum, Gildea earned $144,300 during the 2017–18 school year; $213,925 during the 2018–19 term; and $215,360 in 2019–20, while Palmer earned $141,000 during the 2017–18 term; $127,550 in 2018–19; and $133,304 in 2019–20, or $171,731 in total less than Gildea over the three-year period. Both Gildea and Palmer earned more each year than their base salaries, in variable additional amounts year to year, but neither party

provides an accounting to explain all of the reasons (such as Gildea's annual BMA stipend) that Palmer and Gildea earned higher total pay per year compared to their base salaries. The parties do agree that much of Gildea's additional pay came from his teaching "overload" classes, which are classes taught beyond the required teaching load for a lecturer and for which lecturers are paid per additional class taught. Additionally, it is undisputed that Gildea received higher percentage raises than Palmer in each of the three school years from 2017–2018 through 2019–2020.

B

On May 15, 2019, Palmer filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging race discrimination in violation of Title VII. In that filing, Palmer stated that he had "outlined a significant number of concerns regarding racial discrimination" in his August 2018 call with Maines. The EEOC issued a Right to Sue Letter on August 21, 2019, and Palmer initiated this suit on November 19, 2019.

Before the district court, Palmer alleged race discrimination in two forms: (1) IU's failure to promote him to senior lecturer after his third year and (2) unequal pay. For both claims, he presented Gildea as his only comparator, arguing that IU had discriminated against him based on his race, because Gildea was promoted early to senior lecturer and earned more than Palmer in aggregate between 2017 and 2019. The district court granted IU's motion for summary judgment on all claims.

II

Palmer appeals the district court's ruling on both the failure to promote and unequal pay claims, and we consider each

6 No. 21-1634

in turn. We review the district court's grant of summary judgment de novo, reading the facts in the light most favorable to the nonmoving party, which in this case is Palmer. See *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020).

A

First, Palmer alleges a failure-to-promote violation because Krishnan deterred him from seeking an early promotion due to his race. Title VII makes it unlawful for an employer to fail to promote an individual because of his race. 42 U.S.C. § 2000e-2(a)(1); see, e.g., *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021). IU contends Palmer has no claim because he never actually applied for the early promotion. But we do not reach the merits of these arguments because Palmer's failure-to-promote claim is untimely.

Title VII race discrimination claims are time-barred if not first filed with the EEOC within a statutorily-defined period "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1) (stating the deadline is at most 300 days); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Untimely claims may be saved by the doctrine of equitable tolling. *Id.* at 113. But claims may only be equitably tolled when, "despite all due diligence, a plaintiff cannot obtain the information necessary to realize that he may possibly have a claim." *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 860 (7th Cir. 2005). In such cases, we start the equitable-tolling clock when "a reasonable person in the plaintiff's position would have been aware of the *possibility* that he had suffered an adverse employment action because of illegal discrimination." *Id.* at 861. When applicable, equitable tolling does not restart the clock entirely. Rather, we require that the plaintiff file "within a reasonable time." *Thelen v. Marc's Big Boy Corp.*,

No. 21-1634 7

64 F.3d 264, 268 (7th Cir. 1995). We have previously recognized a reasonable time to file an administrative complaint to be "days, and at most weeks." *Id.*

Palmer's failure-to-promote claim accrued in January 2013, when he discussed the possibility of early promotion with Krishnan, who deterred him from applying. See *Morgan*, 536 U.S. at 110 (a § 2000e–5(e)(1) adverse act occurs on the day that it happens). But Palmer filed his charge with the EEOC over six years later, on May 15, 2019. Therefore, he definitely missed the statutory deadline by several years (which he does not dispute) and must rely on the doctrine of equitable tolling.

But equitable tolling cannot save Palmer's claim. Palmer's stance is that he did not apply for early promotion in 2013 because it would have been a futile act, given Krishnan's discriminatory motivations in deterring him. However, Palmer argues that his claim did not accrue until 2019 because it was only after Gildea's promotion that Palmer realized that discrimination may have been involved in Krishnan's deterring his early application. Even if we were to accept Palmer's argument that his claim did not accrue in 2013, it certainly accrued before 2019 because in July and August 2018, Palmer made allegations in several emails and then on a phone call to Maines that Krishnan had discriminated against him. Then in the email to Maines dated February 10, 2019, Palmer confirmed the timing of those earlier suspicions and reiterated his ongoing belief that discrimination had affected his promotion timeline. So under the doctrine of equitable tolling, his limitations period began to run at the earliest in February 2013 and—at the latest—in August 2018 when he put his suspicion of race discrimination in email.

Case 1:19-cv-04610-JMS-MJD   Document 83   Filed 05/06/22   Page 10 of 18 PageID #: 1645
Case: 21-1634   Document: 00713999985   Filed: 05/06/2022   Pages: 16   (10 of 18)

8                                                                 No. 21-1634

Palmer insists that we should not start the equitable-tolling clock until April 9, 2019, when Gildea actually received his early promotion. But we are not permitted to wait for this level of certainty. The Supreme Court has cautioned lower courts to apply the doctrine of equitable tolling only "sparingly" in order to preserve the procedural requirements set by Congress. *Morgan*, 536 U.S. at 113–14. The rule in our circuit is that a plaintiff must file when he realizes that he may *possibly* have a claim. "Possibly" does a lot of work in such cases—"[u]nder this circuit's case law, a plaintiff awakens to the possibility of a Title VII claim far sooner than he achieves any level of certainty that his rights have been violated." *Beamon*, 411 F.3d at 861. As indicated in emails that he wrote, Palmer realized he may possibly have a claim of racial discrimination at the latest by August 2018.

Palmer filed his EEOC claim nearly nine months later, on May 15, 2019. This is far longer than the delayed filing period we have allowed when applying equitable tolling in prior cases, and comfortably falls outside of the meaning of a "reasonable time." See, e.g., *Kren v. City of Springfield*, 142 F.3d 440 at *2 (7th Cir. 1998) (unpublished) (waiting just over nine months to file an EEOC complaint was not "within a reasonable time"); see also *Thelen*, 64 F.3d at 286 and *Denney v. Eaton Corp.*, 165 F.3d 31 at *2 (7th Cir. 1998) (unpublished) (both stating that waiting nearly ten months to file an administrative complaint was not "within a reasonable time"). Palmer provides no case that would support a finding that the length of time he waited to file his claim was reasonable—regardless of whether that delay be counted as only three months (the amount of time he waited to file after he accused IU of discrimination over email in February 2019), nine months, or six

No. 21-1634                                                                                                                           9

years. Therefore, Palmer's claim cannot be saved by equitable tolling, and his failure-to-promote claim is time-barred.

B

Next, we consider Palmer's unequal pay claim. Title VII bars race-discrimination with respect to compensation. 42 U.S.C. § 2000e-2(a)(1). This claim is indisputably not time-barred under the Ledbetter Act, 42 U.S.C. § 2000e-5(e)(3), allowing Palmer to challenge his pay starting from the two years preceding his EEOC charge, so from May 2017. See, e.g., *Poullard v. McDonald*, 829 F.3d 844, 853 (7th Cir. 2016) (explaining that the statute of limitations for an unequal pay claim resets with each paycheck affected and the plaintiff can "recover up to two years of back pay so long as the unlawful practice occurring during the charge filing period is 'similar or related to' the unlawful compensation practices that occurred outside that period.") (quoting § 2000e-5(e)(3)(B)).

When pursuing an unequal pay claim, the plaintiff must show that the protected grounds—here, race—caused the disparity in compensation. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). In assessing such claims at the summary judgment stage, we consider all the evidence in the record, "eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765); *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020) (a plaintiff is permitted to make out a discrimination case without relying on the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). All that matters at this stage is whether the totality of the evidence permits a reasonable juror to conclude that there would have been no disparity in pay were Palmer a different race "and everything else had

remained the same." *Vega*, 954 F.3d at 1004 (quoting *Ortiz,* 834 F.3d at 764).

Palmer argues that the totality of the evidence permits a finding that IU paid him unequally during the 2017–18, 2018–19, and 2019–20 terms because of his race. But an unequal pay claim begs for some comparator evidence: *unequal to what*? And here Palmer's argument hits a glitch.

A suitable comparator is an employee who is directly comparable to the plaintiff "in all *material* respects." *Warren v. Solo Cup Co.*, 516 F.3d 627, 630–31 (7th Cir. 2008). There must be "enough common factors" between the plaintiff and his comparator "to allow for a meaningful comparison." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (cleaned up). But "[p]rofessors are not interchangeable like widgets," so Palmer merely showing that his comparator is also a lecturer in the same department is not enough to meet his burden that the two are comparable. *Spencer v. Va. State Univ.*, 919 F.3d 199, 204, 208 (4th Cir. 2019), as amended (Mar. 26, 2019). Such a showing is merely a "broad generalization about tasks and skills, which appl[ies] virtually to all teachers, [and] fail[s] to satisfy [the plaintiff's] burden to show equal work." *Id.*

Palmer insists that we should compare his pay to that of only one other lecturer in the Marketing Department, Josh Gildea, and that, rather than compare their base pay, we should compare their total income including stipends. Palmer's narrow argument fails because Gildea's income does not provide a proper framework for comparison. Looking beyond the fact that both Palmer and Gildea are lecturers in the Marketing Department, "a litany of concrete differences underscore that [Palmer] does not perform work equal to that of [Gildea]." *Id.*

No. 21-1634              11

Palmer has always earned a higher base pay than Gildea (and, indeed, higher than every salaried lecturer in the department). But during the relevant timeframe (from the onset of the 2017–18 school year to the end of the 2019–20 school year), Gildea was paid $171,731 more than Palmer in total. Of this sum, $105,000 was for Gildea's role as Director of the BMA, which Palmer concedes was separate from and additional to the role of lecturer.[1] Palmer still takes issue with the remaining $66,731, which he attributes to two factors that he says can only be explained by race discrimination: (1) Gildea earned additional compensation for the overload classes that he taught during this period and (2) Gildea received higher raises than Palmer from 2017 onward. But neither provides support for his unequal pay claim.

First, the stipends Gildea earned for the overload classes he taught do not provide a basis for an unequal pay claim. At the very heart of an unequal pay claim is the plaintiff's burden to show unequal pay for *equal* work. See, e.g., *Poullard*, 829 F.3d at 854. Gildea's additional income from teaching overload classes that Palmer did not also teach cannot be the basis of an unequal pay claim because the work performed was not equal. See *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846

---

[1] Palmer's briefs state that only $60,000 was for Gildea's role as the Director of the BMA, leaving a $111,731 difference after subtracting the BMA payments. However, the undisputed facts show that Gildea earned the $30,000 stipend for his BMA role for each of the three years in issue, 2017–18, 2018–19, and 2019–20. Furthermore, Palmer argues that Gildea earned two $7,500 summer stipends for his work in the BMA, which Gildea's offer letter in the record shows that he received through 2019. Therefore, the total amount attributable to Gildea's role as Director of the BMA is the sum of three $30,000 stipends and two $7,500 summer stipends, or $105,000.

Case 1:19-cv-04610-JMS-MJD Document 83 Filed 05/06/22 Page 14 of 18 PageID #: 1649
Case: 21-1634 Document: 00713999989 Filed: 05/06/2022 Pages: 16 (14 of 18)

12 No. 21-1634

F.3d 216, 227 (7th Cir. 2017) (declining to find evidence of unequal pay when the plaintiff's alleged comparator was performing duties similar to the plaintiff's position *plus* additional duties in a different position).

Recognizing that Palmer's duties were not all directly comparable to Gildea's, Palmer attempts to advance his unequal pay claim by arguing that he was denied similar opportunities to teach overload classes. While the denial of an opportunity may provide the basis for a Title VII claim, it provides no basis for Palmer's unequal pay claim, which requires unequal pay for equal work. Palmer cannot establish an unequal pay claim by arguing that a requirement for a successful claim—equal work—can be excused in the event of unequal opportunities. Denial of equal career opportunities is a separate claim that Palmer has not made. See 42 U.S.C. § 2000e-2(a)(2); see also *Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002) (concluding that "an employer's deliberate denial of career opportunities could constitute an adverse employment action"). Palmer insists his claims on appeal are limited to unequal pay and a failure to promote. So we take this line of argument based on the alleged denial of equal opportunities no further.

What survives of Palmer's unequal pay claim is only that Gildea's base pay climbed near to Palmer's between 2017 and 2019 because Gildea earned higher annual raises than him. But Gildea earned higher raises than everyone in the department. Palmer does not dispute that it was uncommon for lecturers in the department to receive raises exceeding 5%, as Gildea did, or that Palmer's raises were in line with others in the department. While Palmer highlights that both are lecturers in the Marketing Department with good student ratings,

No. 21-1634                                                            13

the record shows that beyond those broad similarities, Gildea was an outlier in the department and not a proper comparator.

Gildea taught so many overload classes between 2017 and 2019 that he completed five years' worth of a lecturer's teaching load in his first three years at IU. And though he was separately compensated for completing each course, the district court found that these overload courses increased not only Gildea's depth of experience (nearly double the hours of teaching experience Palmer had under his belt at his three-year mark) but also the breadth—spanning ten different courses in several different subject areas across both the undergraduate and graduate programs (compared to Palmer's experience at his three-year mark which was primarily in three courses in the undergraduate program). In short, Gildea's overload courses enabled him to ramp up more quickly to the experience level of a lecturer who had worked for more years, and IU was entirely permitted to steepen his raises to account for that. See *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011) ("[T]he comparators must be similar enough that any differences in their treatment cannot be attributed to other variables."). Moreover, IU stated that it sought to compensate Gildea with raises for his *success* as Director of the BMA. After he started as Director, a position which the undisputed facts show carried extensive responsibilities atypical for any lecturer and the starting salary for which would have been significantly higher than for a lecturer, Gildea grew the BMA into the largest academy in the MBA program between 2017 to 2019. There is no available comparison to Palmer's administrative position because Palmer resigned from his role as Diversity Coach in 2017, the first year that Gildea was hired, explicitly declining to remain

Case 1:19-cv-04610-JMS-MJD  Document 83  Filed 05/06/22  Page 16 of 18 PageID #: 1651
Case: 21-1634  Document: 00713995983  Filed: 05/06/2022  Pages: 16  (16 of 18)

14                                                              No. 21-1634

in the role when it became more focused on growth through recruiting. See *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) (stating that a difference in performance history is a variable that can explain differences in treatment of a plaintiff and his alleged comparator). Palmer insists that IU gave too much credit to Gildea for the growth of the BMA, but "we are not a super-personnel board," so we do not review compensation committees for their business acumen. *Guerrero v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001) (holding that "we may not punish an employer for choices that constitute business decisions alone").

Without any comparator in the record against whom Palmer was underpaid, the totality of the evidence simply does not support a reasonable inference of race discrimination against Palmer when it came to his pay.

AFFIRMED

No. 21-1634 15

EASTERBROOK, *Circuit Judge*, concurring. From 2017 through 2019 Josh Gildea was the highest-paid lecturer in the marketing department of the Kelley School of Business. Paul Palmer was the second-highest-paid lecturer. Palmer contends that this difference proves racial discrimination. I agree with my colleagues that it does not, because it does not imply that Palmer would have fared better if he were white and all else remained the same. See *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). So I join the opinion for the court. I add a few words about the sort of inference Palmer wants us to draw.

In every distribution of numbers, one is highest. This is a fact about numbers; it is equally true if the numbers concern incomes, the weight of starlings, or the height of foam in beer glasses. Most distributions are normal, with upper and lower tails plus a bell-shaped middle. If every member of the faculty at Indiana University were white, a distribution of incomes still would exist, without any chance that it had been caused by racial discrimination.

Suppose the third-highest-paid lecturer were to file a suit and contend that Palmer's higher pay shows discrimination. That would make no more sense than Palmer's contention that being #2 shows discrimination. All the difference shows is a distribution of incomes; it does not imply that, if Gildea and Palmer were the same race, Palmer would be the highest-paid lecturer. But if Palmer is right, then *every* lecturer at the Kelley School (other than Gildea) is a victim of racial discrimination, because all are paid less than some other lecturer of a different race. Is Indiana University really engaged in rampant discrimination in favor of non-white lecturers, shown by

Case 1:19-cv-04610-JMS-MJD Document 83 Filed 05/06/22 Page 18 of 18 PageID #: 1653
Case: 21-1634 Document: 00713999983 Filed: 05/06/2022 Pages: 16 (18 of 18)

16 No. 21-1634

the fact that Palmer's income exceeds all but one of the other lecturers?

Teachers are not fungible, as the court's opinion observes. To rest a claim of discrimination on levels of compensation it would be necessary to compare the median income of one ethnicity or sex against the median of another, as in *King v. Acosta Sales & Marketing, Inc.*, 678 F.3d 470, 475 (7th Cir. 2012), or to construct a statistical model that would reveal the weights the Kelley School gives to teaching (quantity and quality), scholarship (quantity and quality), and community service such as committee work, so that any effect of race or sex could be isolated. Palmer did not try either of these approaches. He stopped with the observation that Gildea had higher total compensation, and that observation does not hint at racial discrimination.